NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180631-U

NO. 4-18-0631

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 2, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Coles County |
| SHAWN D. ADAMSON, | ) | No. 16CF242 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Matthew L. Sullivan, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justice Harris concurred in the judgment.
Justice Turner specially concurred in part and dissented in part.

**ORDER**

*Held*: The appellate court affirmed defendant's conviction for possession of a firearm by a felon but reversed and remanded for a new trial on the remaining counts, finding there was no plain error in the admission of witness Shafer's and witness Vasquez's prior statements and no plain error in the admission of witness Perry's statements. However, defense counsel was ineffective for failing to object to the admission of the aforementioned statements.

¶ 1 Defendant, Shawn D. Adamson, was charged with two counts of first degree murder, one count of attempt (armed robbery) (720 ILCS 5/8-4(a), 18-2 (West 2016)), one count of conspiracy to commit armed robbery (720 ILCS 5/8-2(a), 18-2 (West 2016)), and one count of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2016)). The first count of first degree murder alleged defendant, while attempting to commit the forcible felony of armed robbery, proximately caused the death of Ciara Faires (720 ILCS 5/9-1(a)(3) (West 2016)). The second count of first degree murder alleged defendant committed first degree murder

while committing the forcible felony of mob action that proximately caused the death of Ciara Faires (720 ILCS 5/9-1(a)(3) (West 2016)). Both first degree murder charges contained a special enhancement of 15 years for committing the offense while armed with a firearm (730 ILCS 5/5-8-1(d)(i) (West 2016)) and an enhancement of 20 years for personally discharging a firearm during the commission of the offense (730 ILCS 5/5-8-1(d)(ii) (West 2016)). The charges allege defendant was present where shots were fired by a third party which resulted in the death of Ciara Faires.

¶ 2       After a week-long trial, the jury convicted defendant on all counts. The trial court sentenced defendant to 33 years in the Illinois Department of Corrections with an enhanced 20-year sentence for personally discharging a firearm during the commission of first degree murder and a 10-year concurrent sentence for possession of a firearm by a felon. On appeal, defendant argues (1) the trial court erred by admitting witness Shafer's prior trial testimony into evidence, after his refusal to testify, in violation of defendant's right to confront the witnesses against him; (2) the trial court erred by admitting hearsay statements of witness Vasquez; (3) the trial court erred by admitting irrelevant and highly prejudicial other bad-acts evidence through the testimony of witness Perry; and (4) defense counsel rendered ineffective assistance. We affirm in part, reverse in part, and remand.

¶ 3                          I. BACKGROUND

¶ 4       During the morning of June 16, 2016, Todd Shafer and Brett Magana obtained firearms from defendant at defendant's house for the purpose of robbing Justin Davis of marijuana and cash. Shafer and Magana backed out of committing the robbery and spent the next 40 hours eluding defendant in fear of perceived retribution for keeping the firearms after failing to complete the robbery. At approximately 10:30 p.m. on June 17, 2016, Shafer and his

girlfriend, victim Ciara Faires, packed their belongings with the intent to travel to Texas. Before leaving, they arrived at Dion Dixon's apartment, where Ciara and Shafer began to argue about their plan to flee. During the argument, Dixon tossed Ciara's belongings outside, and Shafer pushed her outside and locked the door while he and Dixon continued arguing. Defendant and his cohorts, Kevin Johnson and Matthew Cook, were outside looking for Shafer to retrieve the firearm he never returned. Defendant was allegedly armed with a handgun. Johnson asked Ciara to text Shafer to come outside. The State was allowed to introduce testimony from Shafer's previous trial concerning his account of what happened next. Shafer testified at his trial that after a loud "bang" at the door, he looked outside, saw other people standing next to the victim, saw a silver revolver, and saw a "flash" and heard a "pop." Shafer, still possessing the firearm from the botched robbery, fired two shots through the door, one of which killed the victim, his girlfriend. Dixon testified he was not sure if he saw a gun when he looked outside but that Shafer fired a shot through the door, and they both ran to Dixon's bedroom, where Dixon called 911. Ciara died in the early morning hours of June 18, 2016.

¶ 5        In February 2017, the State filed motions *in limine* seeking to admit certain hearsay statements relating to defendant's attempts to retrieve firearms from Magana and Shafer prior to the shooting and "other-crimes" evidence. The State argued the other-crimes evidence demonstrated a continuing narrative of events that led to the shooting death of the victim and "explains aspects of the charges, the event, and the behavior of the defendant which would otherwise be implausible or inexplicable." The evidence of other crimes or bad acts sought to be admitted consisted of events that unfolded after providing firearms to Magana and Shafer for use in an armed robbery. The State argued, upon learning of Magana and Shafer backing out of the armed robbery, defendant and his coconspirators then attempted to retrieve the firearms. The

State outlined various statements it sought to admit in order to show the course of conduct of defendant and others while attempting to retrieve the firearms.

¶ 6          In February 2018, the trial court held a status hearing to discuss pending pretrial motions on file, including the admission of other-crimes evidence. The defense did not object to any of the State's motions *in limine* at that time, indicating, "there is no objection, Judge. I guess when we get there, there may be one. It is going to kind of depend on the witness testimony. So, at this point, I don't have an argument, but that could potentially change. I just want to be up front with the Court."

¶ 7                              A. Acknowledgment Hearing

¶ 8          The State planned to call a witness, James Shafer, to testify. Approximately nine days before, Shafer was convicted of first degree murder of Ciara Faires at his own trial where he testified on his own behalf. The State was uncertain if Shafer would cooperate or answer questions, so it asked the trial court to conduct an acknowledgment hearing outside the presence of the jury to ascertain whether Shafer would acknowledge making any of the statements he made during direct examination at his trial. See *People v. Brothers*, 2015 IL App (4th) 130644, ¶¶ 74-75, 39 N.E.3d 1101. The court had already conducted such a hearing when, in the midst of his testimony, another codefendant, Kevin Johnson, decided to stop answering questions during cross-examination. The State confirmed with Shafer that he was provided use immunity for any incriminating statements he may make, and the State had agreed there would be no additional charges. See 725 ILCS 5/106-2.5 (West 2016) (The State can give witness use immunity if witness's testimony is necessary and the witness is otherwise likely to invoke his fifth amendment privilege against self-incrimination.). Shafer informed the court he would not be

answering any questions posed to him even after the court explained the possibility of being found in direct criminal contempt for refusing to answer questions under oath.

¶ 9        During the acknowledgment hearing, the State began asking Shafer the questions he had been asked on direct examination during his own trial and asked about the responses he gave at that time. Aside from several preliminary questions about the grant of use immunity and agreement there would be no further charges, Shafer refused to answer. The prosecutor continued to ask Shafer over 188 questions posed to him during his trial and asked him about the corresponding answer he provided. During this exchange, Shafer's response was, "I am not answering any more questions," or something similar thereto. During the exchange, the trial court instructed Shafer to answer the prosecutor's questions, but Shafer refused.

¶ 10        After refusing to answer the State's questions on direct examination, defense counsel asked him three or four questions on cross-examination, which Shafer also refused to answer, responding in the same manner. After doing so, the trial court stated, "Mr. Shafer, you understand that I am directing you to answer those questions, correct?" Shafer responded, "I understand, but they should have thought of that before they took my life away from me." After Shafer again confirmed he would not respond to any more questions, the court found him in direct criminal contempt.

¶ 11        During the trial, but outside the presence of the jury, the prosecutor and defense counsel provided the trial court with a joint proposed instruction to be read to the jury prior to the introduction of Shafer's trial testimony. The parties agreed to have Shafer's prior trial testimony, on both direct and cross-examination, read into the record by the court reporter. When asked, defense counsel stated it was his request the instruction be read to the jury. Before agreeing to accept the proposed instruction, the court inquired whether defense counsel conferred with

defendant about proceeding in such a fashion. Defense counsel said he had and defendant agreed.

Counsel then commented that even if defendant had not agreed, defense counsel would intend to

proceed in this manner as part of the defense's trial strategy. The court then asked defendant if

counsel had talked with him about proceeding in this manner and if he agreed with it. Defendant

responded in the affirmative to both questions. Considering Shafer's refusal to answer any

questions during the acknowledgment hearing, defense counsel informed the court they were

waiving cross-examination. The court found Shafer's previous testimony to be material and

relevant, he was previously provided use immunity, defendant had been provided an opportunity

for cross-examination, and it declared the witness unavailable. The instruction given before the

reading of Shafer's prior trial testimony consisted of the following:

> "Ladies and gentlemen, a witness who was a subpoenaed
>
> witness[,] James Todd Shafer[,] refuses to testify in this matter
>
> after being ordered by the Court to answer questions posed to him.
>
> You are going to hear testimony by way of transcript from his
>
> criminal trial. The believability of a witness may be challenged by
>
> evidence that on some former occasion he made a statement that
>
> was not consistent with his testimony in this case. The witness's
>
> refusal to testify constitutes an inconsistent statement as a matter of
>
> law. Evidence of this kind ordinarily may be considered by you
>
> only for the limited purpose of deciding the weight to be given the
>
> testimony you heard from the witness in this courtroom: however,
>
> you may consider a witness's earlier inconsistent statement as

evidence without this limitation when the statement was made

under oath at a trial."

The court reporter then read the questions asked and answers given by Shafer during his testimony at his trial. Shafer's testimony included his version of the events leading up to the death of Ciara, his drug use at defendant's home, that defendant owned firearms, that defendant was "infamous" in the community, and he saw someone outside Dixon's residence with a silver revolver that made a "flash" and he heard a "pop" before Ciara was killed. He admitted firing the weapon found inside Dixon's apartment. Along with Shafer's prior testimony, the State presented video evidence and witness testimony placing defendant at the scene with a firearm.

¶ 12                                    B. Jury Trial

¶ 13                                    1. *Mary Jo Perry*

¶ 14        One witness called was Mary Jo Perry, and after admitting her criminal history and acknowledging she is currently serving a sentence on drug court probation, Perry testified she had known defendant for a long time. She said that on June 17, 2016, at approximately 2:40 a.m., she received a phone call and went to Johnson's residence on Prairie Street expecting to see Adrian Vasquez, another witness later called by the State to relate statements of the defendant. She was seven months pregnant at the time. She testified that when she arrived, the door opened and defendant pointed a black gun at her face. She said she saw Cook there with another black gun. At that time, her niece was dating Tyler Jordan and defendant asked if Perry would let him in her niece's house so he could "go after him." After they all "got high," Perry went to defendant's house, saw defendant with a silver revolver with a long barrel, and saw him load it with ammunition. Defendant then mentioned again how he wanted to "get back" at Tyler Jordan

as retribution from a previous feud, it "would be war," and that "bullets would fly." Defendant did not object to any of Perry's testimony.

¶ 15                                    2. *Adrian Vasquez*

¶ 16            Adrian Vasquez, at the time of trial, was incarcerated in the Illinois Department of Corrections. He testified he had known defendant for most of his life and was living in Mattoon in June 2016. During the relevant time period, around June 17 or 18, 2016, he and defendant were looking for Shafer in order to obtain the return of a gun given to Shafer earlier. Vasquez had a conversation with defendant while Vasquez and defendant were incarcerated in Mt. Vernon, Illinois. Vasquez gave a statement to the Mattoon Police Department on June 21, 2016, indicating defendant made inculpatory statements. Defendant informed Vasquez he was present at the scene of the shooting and fired a weapon in the air toward the window of the house. The prosecutor repeated a series of questions the police asked Vasquez during his interview regarding certain admissions made by defendant at the time. Vasquez either denied making the earlier statement or claimed he did not remember providing a specific answer. The State recalled a prior witness who laid the foundation for the audio and video recordings of Vasquez's interview and the interview transcript. All three were admitted into evidence without objection from the defense. In the statements, Vasquez said defendant admitted having a gun when they were at Dixon's residence, that they were there to intimidate "them," and he admitted firing a shot at the time.

¶ 17                        3. *Video Evidence and Explanatory Testimony*

¶ 18            The State called two witnesses who laid the proper foundation for the admission of video evidence without objection. The first video was from a camera at the apartment complex

where the shooting occurred and the second was surveillance video from Hinckley Springs Bottled Water (Hinckley Springs), which was located in the vicinity of the shooting.

¶ 19 Deputy Chief Gaines was a lieutenant involved in investigations. He acknowledged acquiring the surveillance video from defendant's apartment as well as from security cameras located at the Hinckley Springs building, which was in the immediate vicinity of where the shooting occurred. The State published videos from defendant's surveillance system date-stamped June 16, 2016, at 5:51 a.m., almost two days before the shooting and the morning of the botched robbery. The videos showed Shafer and two friends exiting defendant's residence with a bag, later determined to contain the guns obtained from defendant which were to be used in the robbery of Justin Davis. Gaines identified another surveillance video, also taken on June 16, 2016, at 6:06 a.m., from 1221 Broadway Avenue, the apartment complex which was the scene of the failed robbery by Magana and Shafer. The video showed Magana and Shafer entering the apartment complex hallway with Shafer still carrying a black bag. Gaines testified that shortly before the shooting on June 18 at 12:14 a.m., the video from Hinckley Springs showed a vehicle stop and a passenger exit the vehicle in front of Dixon's address at 313 South 21st Street, the apartment where the shooting occurred. Shortly after the shooting, defendant's surveillance system showed two males running toward his house and a female, identified as Brieanna Laidley, on the front porch. Gaines also identified Matthew Cook as the person walking toward defendant's residence shortly after the shooting.

¶ 20 The State presented other witness testimony giving accounts of what happened on the day of the shooting.

¶ 21 4. *Brieanna Laidley*

¶ 22        Brieanna Laidley testified she had known defendant and witnesses Johnson and Cook for years. She stated she knew all three of them from when she previously used drugs. Laidley is the sister of the deceased victim, Ciara. She testified that on June 17, 2016—the day before Ciara was killed—she was at defendant's house at 2216 Charleston Avenue, about 2½ blocks from the shooting, and saw defendant pull out two blue cases, each containing a gun. One was a silver revolver and the other a black handgun. Laidley further testified that on June 18, 2016, shortly before 12:30 a.m., and shortly after the shooting, she was driving back to defendant's house from a nearby gas station when she saw defendant and Johnson running behind a building. She arrived at defendant's house and let herself in. When she looked at the security camera monitor located inside the house, she saw defendant and Johnson running toward the house. She described Johnson as "frantic" and "moving back and forth kind of like a jittery, nervous kind of movement." She described defendant as looking "scared" and "he was pouring sweat." She said defendant had on a hoodie and she saw a silver-barreled gun inside his pants.

¶ 23                        5. *Nicole Chronic and Robin Bailey*

¶ 24        Nicole Chronic testified that during the night of the shooting, she was at her apartment at 420 North 21st Street, planning to have a cookout with her mother and aunt, when she heard a loud knock on her front door. She opened it and saw Shafer, who pushed past her and entered the apartment. She saw Cook outside running through the courtyard, apparently chasing after Shafer. Shafer looked frantic, out of breath, and fidgety. Shafer told her Cook was chasing him because "they" wanted a gun back. After making a phone call, he was picked up by the victim, Ciara. Later, while outside, Chronic was approached by Johnson, who asked if she had seen Shafer. A short time later, she was approached by defendant and Cook. When asked where Shafer was, she said he left her apartment and was picked up by Ciara. She heard defendant say

he needed to get his "hardware" back. According to Chronic, defendant and Johnson stayed at her apartment for a period of time and eventually she saw them standing in different locations around the apartment building. Chronic's aunt, Robin Bailey, also testified and confirmed Johnson and defendant were at Chronic's apartment. Defendant went into a bedroom, looked underneath the bed, and then left.

¶ 25                                    6. *Letha Shafer*

¶ 26        Letha Shafer is Todd Shafer's mother and lives across the street from Nicole Chronic. On the day of the shooting, Cook, Johnson, and defendant came to her apartment. Defendant told her that her son had two hours to bring the "hardware" back and he did not care about the bullets. She told her son about this conversation.

¶ 27                                    7. *Melanie Houts*

¶ 28        Melanie Houts testified she knew Ciara and Shafer. She said she saw them both on the day Ciara was killed. She was walking to Johnson's house at the time of the shooting. Upon arriving at his house, she saw defendant holding a revolver with a long barrel. She testified defendant was acting abnormally, as he was sweating and talking on the phone about "burning a hoodie."

¶ 29                                    8. *Patricia Burries*

¶ 30        Patricia Burries testified she worked in Arcola on the day of the murder and returned to her home in Mattoon shortly after midnight. She testified that, upon her return, she saw a person standing at the street corner on the other side of the street from her residence, zipping up a hooded jacket. She went inside and when she came back out, she heard two loud noises. After the noises, she saw Johnson and Cook walking very fast down the street and she

saw defendant running through the bushes wearing a hooded jacket. She saw them all go to defendant's mother's house, which was down the street.

¶ 31                                    9. *Kevin Johnson*

¶ 32          Kevin Johnson testified he pleaded guilty to attempted robbery for probation, and as a condition of the plea, he was ordered to testify truthfully and consistently as a witness in this matter. He testified he is close friends with defendant and also friends with Shafer. He said on the evening of the murder, he was dropped off at Dion Dixon's apartment by Nicole Chronic. When he arrived, he met up with defendant and Cook. He said the victim, Ciara, was standing outside on the back porch. When confronted with his previous testimony from Shafer's trial, Johnson refused to answer the prosecutor's questions and continued to talk over the trial court and the prosecutor until the court had to excuse the jury. After a discussion with the witness, the court found the prosecutor was permitted to treat him as a hostile witness. Upon the jury's return, he refused to answer any more questions and was held in direct criminal contempt. The court, the State, and defense counsel had a discussion off the record where it was agreed this witness was deemed unavailable because of his refusal to answer questions. During the discussion in the court's chambers, the court presumed the State wanted to use Johnson's previous testimony in Shafer's trial as substantive evidence. The State expressed hesitancy in being able to do this absent a finding of forfeiture by wrongdoing, stating: "I am not certain we can do that, because this counsel has not had an opportunity to cross-examine." The court then directed the State to the statute on prior inconsistent statements and *Brothers*. Although the State continued to express doubt about the admissibility of Johnson's prior statements as substantive evidence, the court insisted it interpreted the *Brothers* case to say, "[o]nce he is deceptive or refuses to answer, the entire statement may come in." The defense attorney also sought to, as diplomatically as

possible, disagree with the trial court's assessment of the statute and case law. The State interjected, citing *People v. Evans*, 2016 IL App (3d) 140120, 60 N.E.3d 77, which discussed the confrontation clause, and attempted to convince the court it required the opportunity for cross-examination *at the specific trial from which the testimony was taken*. The trial court continued to argue its position that cross-examination was not necessarily required at all. The State then noted the reference to an acknowledgment hearing in *Brothers* and the court and counsel discussed the procedural mechanics for doing so.

¶ 33 Upon returning to the courtroom, the parties conducted an acknowledgment hearing with Johnson on the witness stand. Outside the presence of the jury, he was confronted with his previous testimony in Shafer's trial. In his previous testimony, Johnson said he received a text message from defendant about getting his gun back from Shafer. He admitted that he, defendant, and Cook approached Ciara when they were looking for Shafer. Defendant had a weapon, which scared Ciara when he approached. Johnson said he took Ciara away from the immediate vicinity of the porch and asked her to text Shafer to come outside, which she did. At this point, Johnson began objecting to having to testify against defendant because, as he had explained earlier, the victim's shooting was caused by Shafer from inside and was an accident. But then Johnson reluctantly agreed to answer the questions once the jury returned. The jury was brought back into court and Johnson answered the questions posed to him. He testified he went to Dixon's apartment the night of the shooting with Cook and defendant to find Shafer. He also testified that when they arrived, Ciara was outside Dixon's apartment and he attempted to get her to text Shafer to come outside. Additionally, he said defendant had a revolver in his hand, heard a gunshot, saw defendant put a silver revolver in his pocket, and believed defendant had almost shot himself while trying to put the gun away. Then he, defendant, and Cook ran away and went

- 13 -

to defendant's house. As he was running, he thought Ciara was running too. Johnson also corroborated Chronic's previous testimony that he and defendant went to Chronic's house looking for Shafer.

¶ 34                                    10. *Dion Dixon*

¶ 35            Dion Dixon testified that Shafer and the victim came to his apartment at 313 South 21st Street on the evening she was killed. Shafer and the victim were arguing, and Shafer shoved the victim outside and closed and locked the door. As Dixon was attempting to get Shafer to leave, something caught his attention. He looked outside his window and saw two people standing next to the victim. A third person banged on his door and Dixon thought he saw a gun. Shafer fired a shot through the door and they both ran to Dixon's bedroom, where Dixon called 911. On cross-examination, Dixon admitted he was not sure if he saw a gun and that he never heard any gunshots outside his residence. The 911 dispatcher was then called to lay the foundation for the 911 phone call, which was subsequently entered into evidence and published to the jury. On the 911 call, Dixon reports to the operator that people are "shooting," a window had been shot out, and that his friend had been shot.

¶ 36                                    11. *Matthew Cook*

¶ 37            Matthew Cook testified that he is friends with defendant and the day before the shooting, he sent defendant a Facebook message saying he found Shafer. He was helping defendant find Shafer to get a firearm from him.

¶ 38                                    12. *Mattoon Police Department*

¶ 39            Several members of the Mattoon Police Department provided testimony regarding the department's investigation into the shooting. After executing search warrants at defendant's home and defendant's mother's house, police officers found a blue gun case in defendant's attic.

There was a barcode located on the gun case indicating it was supposed to contain a silver Smith & Wesson .41-caliber revolver with a barrel length of 7½ inches. Additionally, located in defendant's mother's house was a bag that contained a blue Colt gun case and a black gun case. The bag also contained an owner's manual and cleaning rod for a Glock firearm. Other officers testified about finding Ciara after the shooting and securing the scene, locating text messages on defendant's phone demanding the return of firearms from Magana, and locating a firearm and two spent shell casings within Dixon's apartment. There were also two bullet holes in the apartment's back door which appeared to have come from inside the residence. Two officers attended Ciara's autopsy and witnessed the removal of a projectile from her body, which was later matched to the handgun found in the Dixon residence.

¶ 40　　　　　A forensic scientist with the Illinois State Police specializing in firearms and tool mark identification testified about his analysis of the two fired cartridge cases found in Dixon's home and comparison to the test shots fired from the gun found there. He concluded both cases were ejected from the gun found in the residence. Additionally, he said the projectile removed from Ciara's body was fired from the same gun found in the residence. The forensic pathologist who conducted the autopsy on Ciara testified he found a gunshot entrance wound on her left lateral chest and an exit wound on her right lateral chest. There was a reentry wound on her right forearm where a bullet was located. He testified the gunshot wound perforated her left lung, heart, and right lung and caused her death.

¶ 41　　　　　　　　　　C. Verdict, Sentencing, and Posttrial Motions

¶ 42　　　　　On March 9, 2018, the jury found defendant guilty of first degree murder premised upon attempt to commit armed robbery, first degree murder premised upon mob action, attempt to commit armed robbery, conspiracy to commit armed robbery, and unlawful possession

of a firearm by a felon. The jury also found defendant guilty of being armed with a firearm and personally discharging a firearm in relation to both first degree murder charges.

¶ 43          In July 2018, defendant filed a motion for a new trial and other posttrial relief. Defendant's motion raised three issues: (1) the failure of the State to prove him guilty beyond a reasonable doubt, (2) his innocence of the charges, and (3) the failure of the State to prove each element of the offenses charged beyond a reasonable doubt. Defendant asked the trial court to set aside the verdicts and enter a verdict of not guilty or grant a new trial. The court denied defendant's motion before proceeding to the sentencing hearing.

¶ 44          At the sentencing hearing, after considering arguments from the attorneys and factors in aggravation and mitigation presented by the parties, the trial court sentenced defendant to 33 years for the offenses of first degree murder, 20 years for the enhancement of personal discharge of a firearm, and a 10-year concurrent sentence for possession of a weapon by a felon.

¶ 45          In late July 2018, defendant filed a motion to reconsider the sentence, arguing the trial court's previous sentence was excessive and the court failed to adequately consider mitigating factors, including defendant's character, history, and rehabilitative potential. In August 2018, the court heard arguments on defendant's motion and denied it.

¶ 46          This appeal followed.

¶ 47                              II. ANALYSIS

¶ 48          Defendant argues the trial court erred in admitting testimony from Shafer, Vasquez, and Perry. But since he failed to lodge objections to any of these errors, he must demonstrate the errors amounted to plain error. We take each of his arguments in turn, first assessing whether the court erred in admitting Shafer's, Vasquez's, and Perry's testimony and then determining whether any error constituted plain error.

¶ 49      Defendant argues the trial court erred by concluding Shafer met the criteria for unavailability under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2016)) and admitting his previous testimony from his own trial as substantive evidence. Defendant further argues the court's conclusion Shafer was "available for cross-examination" simply because he was called to the witness stand was incorrect, and defendant had no opportunity for meaningful cross-examination at either the previous trial or this one. Although necessarily interrelated, we will address these arguments individually.

¶ 50            A. Admissibility of Prior Inconsistent Statements

¶ 51      Section 115.10.1 of the Code reads, as follows:

"Admissibility of Prior Inconsistent Statements. In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

- 17 -

(C) the statement is proved to have been accurately recorded by a tape

recorder, videotape recording, or any other similar electronic means of

sound recording.

Nothing in this Section shall render a prior inconsistent statement inadmissible

for purposes of impeachment because such statement was not recorded or

otherwise fails to meet the criteria set forth herein." 725 ILCS 5/115-10.1 (West

2016).

¶ 52    Our court has described the process to be used in order to admit prior inconsistent

statements under the acknowledgment provision of section 115-10.1(c)(2)(B) (725 ILCS

5/115-10.1(c)(2)(B) (West 2016)). "To avoid potential prejudice, the jury should not be present

when the party seeking to offer the statement *** first confronts the witness with the prior

statement for purposes of obtaining the witness's acknowledgement that she made the

statement." *Brothers*, 2015 IL App (4th) 130644, ¶ 72. At the acknowledgment hearing, the

witness "must be confronted with, and acknowledge making, each of the specific prior

statements sought to be admitted as substantive evidence." *Brothers*, 2015 IL App (4th) 130644,

¶ 74.

¶ 53    If the witness acknowledges making a previous statement during the

acknowledgment hearing, the prior statement is still not admissible until the witness testifies

inconsistently with the statement in front of the jury. *Brothers*, 2015 IL App (4th) 130644, ¶ 77.

If the witness acknowledges making the prior inconsistent statement in front of the jury, the

witness's acknowledgment of the prior statement is substantive evidence. On the other hand, if

now, in front of the jury, the witness denies making the statement he just admitted to making

during the acknowledgment hearing, the pertinent portions of the transcript of the

acknowledgment hearing can be presented to the jury and admitted as substantive evidence. *Brothers*, 2015 IL App (4th) 130644, ¶ 78. The substantive admissibility of evidence under section 115-10.1 is designed to protect parties from "turncoat witnesses" who attempt to dispute the validity of a previous statement by simply denying the statement when they are on the witness stand. See Robert J. Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638 (1984); *People v. Lewis*, 2017 IL App (4th) 150124, ¶ 30, 78 N.E.3d 527.

¶ 54          While section 115-10.1(c) has several methods by which the prior inconsistent statement can be admitted, it is premised on satisfying the two mandatory requirements of subsections (a) and (b). The prior statement must be inconsistent with the witness's testimony at the hearing or trial *and* the witness must be subject to cross-examination concerning that statement. 725 ILCS 115-10.1(a), (b) (West 2016). If either one of these requirements is not met, the prior statement is not admissible under section 115-10.1. See *People v. Redd*, 135 Ill. 2d 252, 302-03, 553 N.E.2d 316, 338 (1990). Here, the State did not satisfy subsections (a) and (b) because Shafer did not testify at defendant's trial, let alone give inconsistent testimony in front of the jury, and so defendant did not have the opportunity to cross-examine him.

¶ 55          The record reflects the State was aware Shafer was likely to refuse to answer questions and requested an acknowledgment hearing outside the presence of the jury. Shafer's previous statement was his testimony during his own trial. But Shafer refused to answer any substantive questions regarding the night of the shooting and the events leading up to it at the acknowledgment hearing. Consequently, he never acknowledged a prior inconsistent statement, never gave a prior inconsistent statement to this jury, and never submitted to cross-examination about a prior statement. Nevertheless, both parties agreed to have Shafer's previous testimony admitted in its entirety via transcript, in lieu of bringing him in front of the jury to refuse to

answer questions. The problem lies with the fact that at no time was there an acknowledgment by Shafer; he simply refused to answer the questions, and he was never subject to meaningful cross-examination, both matters we discuss below.

¶ 56 We believe the trial court misapplied section 115-10.1 regarding Shafer's statement. Section 115-10.1 was not applicable and provided no basis for the admission of Shafer's testimony at all. As noted above, the two basic requirements for the use of a prior inconsistent statement as substantive evidence are: (1) the statement is inconsistent with a witness's testimony at the hearing or trial and (2) the witness is subject to cross-examination concerning the statement. 725 ILCS 5/115-10.1 (West 2016). Neither requirement was satisfied here. A refusal to answer is not inconsistent with a previous statement; it is a refusal to either admit or deny having made the statement and does not satisfy the requirement of inconsistency in subsection (a). See *Redd*, 135 Ill. 2d 252. Further, it deprives the defendant of any opportunity for meaningful cross-examination. *People v. Evans*, 2016 IL App (3d) 140120, ¶ 50, 60 N.E.3d 77. Since the State failed to satisfy the requirements of section 115-10.1, it was error to admit Shafer's prior testimony.

¶ 57 B. *Crawford* and the Confrontation Clause

¶ 58 The confrontation clause in the sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. The confrontation clause bars out-of-court testimonial statements unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The term "testimonial" can include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial." *Crawford*, 541 U.S. at 68. A claim alleging a violation

of the confrontation clause involves a question of law that is reviewed *de novo*. *People v. Williams*, 238 Ill. 2d 125, 141, 939 N.E.2d 268, 277 (2010).

¶ 59 There is no question Shafer's previous statements were testimonial, since they were made during his earlier trial. Both parties also concede Shafer was made "unavailable" by his refusal to answer any questions posed to him by the State or defense counsel during the acknowledgment hearing. The only question here is whether Shafer underwent cross-examination. Defendant contends the witness's refusal to answer any questions from the State or defense counsel precluded defendant's opportunity to cross-examine him. More importantly, defendant argues defense counsel did not have the opportunity to cross-examine Shafer at the time Shafer testified previously during his own trial.

¶ 60 The admission of testimony by a witness who is unavailable during defendant's trial complies with *Crawford* if the defendant "had an opportunity to cross-examine the witness *at the time of the statement.*" (Emphasis added.) *People v. Brown*, 363 Ill. App. 3d 838, 848, 842 N.E.2d 1141, 1149 (2006). A trial court may admit preexisting testimony of a witness if the witness is unavailable at trial and the defendant had an adequate opportunity to effectively cross-examine the witness when the testimony was given. See *People v. Torres*, 2012 IL 111302, ¶ 53, 962 N.E.2d 919 (citing *People v. Sutherland*, 223 Ill. 2d 187, 273, 860 N.E.2d 178, 233 (2006) (testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine)). Our supreme court in *Torres* made it clear, "the requirements for admission of former testimony are twofold: the witness from the prior hearing must be unavailable at trial and the defendant must have had an adequate opportunity to effectively cross-examine the witness at the prior hearing." *Torres*, 2012 IL 111302, ¶ 53. Generally, a witness is subject to

- 21 -

cross-examination when he takes the witness stand and, under oath, willingly answers questions. *People v. Leonard*, 391 Ill. App. 3d 926, 934, N.E.2d 403, 411 (2009). A declarant is not subject to effective cross-examination when he refuses to answer any of the questions put to him by either the prosecution or the defense. *Redd*, 135 Ill. 2d at 306.

¶ 61        The facts in *Redd* are similar to those before us. There, the prosecutor repeated the questions posed and answers given by the witness from his grand jury testimony, but the witness refused to answer. *Redd*, 135 Ill. 2d at 298. The trial court authorized the admission of the witness's grand jury testimony as substantive evidence, permitted the State to read the questions and answers from the grand jury testimony, and granted defense counsel an opportunity to cross-examine the witness. *Redd*, 135 Ill. 2d at 301-02. The court found the witness's refusal to answer questions during trial equated to inconsistent testimony when compared to his prior grand jury statement. *Redd*, 135 Ill. 2d at 302. On appeal, the State argued defendant had the opportunity to cross-examine the witness because the court allowed defense counsel to ask him questions, even though the witness refused to answer them. *Redd*, 135 Ill. 2d at 303. Defendant argued on appeal that since the witness did not testify on direct examination, he did not have an opportunity for effective cross-examination at the time the witness's statement was made. *Redd*, 135 Ill. 2d at 303. Our supreme court sided with the defense and found the witness's refusal to answer any questions failed to provide defendant with an opportunity to effectively cross-examine the witness about his statements. *Redd*, 135 Ill. 2d at 306.

¶ 62        In our view, *Redd* applies here. When Shafer refused to answer any questions about his prior testimony from either the prosecution or defense, the trial court admitted the prior testimony. But admitting that prior inconsistent testimony proved to be error because, like in

- 22 -

*Redd*, Shafer was not subject to effective cross-examination for *Crawford* purposes. Indeed, his refusal to answer questions could not make him subject to cross-examination at defendant's trial.

¶ 63 Further, the State's cross-examination of Shafer during his own trial could never constitute the "meaningful" cross-examination defendant is guaranteed by the confrontation clause. In *Torres*, the court quoted *Sutherland*:

> " 'For an opportunity to cross-examine to be considered meaningful, and therefore adequate and effective, the *motive and focus* of the cross-examination at the time of the initial proceeding must be the same or similar to that which guides the cross-examination during the subsequent proceeding.' " (Emphasis added.) *Torres*, 2012 IL 111302, ¶ 58 (quoting *Sutherland*, 223 Ill. 2d at 273).

¶ 64 Here, even if we could allow the State's cross-examination of Shafer in the prior trial to translate to this case, that cross-examination would not be "meaningful cross-examination" because it lacks the same motive and focus. The State noted it had only asked questions of Shafer from his direct examination at trial, stating, "during the acknowledgment [hearing] I had raised a foundation solely for the direct examination portion." These would have been questions asked by his own counsel, not the State on cross-examination. The "motive and focus" of Shafer's counsel on direct examination are not the same as defendant's counsel in this case. The testimony sought by the State was that offered by Shafer on direct examination at his own trial. As defense counsel noted, the State's position with regard to Shafer "shifted 180 degrees" from where it was during his trial. More importantly, cross-examination by the State would never fulfill the constitutional right of the defendant to

- 23 -

cross-examine the witness. In *Torres*, the court referenced *Crawford*'s own summary of precedential cases on the confrontation clause: " 'Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where *the defendant* has had a prior opportunity to cross-examine.' [Citation.]" (Emphasis added.) *Torres*, 2012 IL 111302, ¶ 51. The arguments regarding motive and focus still relate to previous confrontation by the defendant, not the opposing party.

¶ 65          It is clear from the physical and ballistic evidence the fatal shot killing Ciara was fired from inside the apartment. There were two bullet holes in the door, showing shots fired from inside; the two shell casings found in the house matched the gun found in the house where Shafer was removed by the police very shortly after the shooting; and the slug found in Ciara's arm was ballistically matched to the gun fired from inside the house. Shafer's testimony at his trial was focused on attempting to show "someone" was shooting at him from outside and he returned fire to defend himself. He would, in effect, be attempting to "point the finger" at defendant and his cohorts. Conversely, at defendant's trial, the effort was to deflect responsibility to someone else, primarily Shafer. Thus, the purposes of examination, and by reasonable deduction, cross-examination, were diametrically opposite of each other.

¶ 66          The record reflects defense counsel, with defendant's consent, waived defendant's right to cross-examine Shafer during the acknowledgment hearing after Shafer refused to answer questions. But that waiver does not end the analysis because counsel did not have an opportunity to cross-examine Shafer at the *time of his prior statement* or *when his prior statement was given*. Here, defense counsel was only afforded the opportunity to cross-examine Shafer when he refused to answer significant questions on direct examination and persisted in that refusal upon

- 24 -

defendant's attempt to cross-examine him. That cross-examination would not have made Shafer's testimony admissible because the record clearly shows defendant did not have an opportunity to cross-examine Shafer when he made the prior statement.

¶ 67 Shafer's prior testimonial statement, outlining the facts, circumstances, and his version of events prior to Ciara's death, was provided almost two weeks earlier in his own trial, where cross-examination was only afforded to the State. Here, defense counsel had no meaningful opportunity to effectively cross-examine Shafer about his statements at the time he made them and had no opportunity to do so in defendant's trial. Therefore, the trial court erred in admitting Shafer's prior testimony.

¶ 68 C. Testimony of Adrian Vasquez

¶ 69 Defendant claims it was error for the court to admit Adrian Vasquez's out-of-court statements to the police because they constituted hearsay and were not admissible as prior inconsistent statements.

¶ 70 Both defendant and the State argue the admissibility of Vasquez's testimony as substantive evidence and for impeachment and, from the record, it appears no distinction was made by the trial court or sought by counsel by way of a limiting instruction to the jury.

¶ 71 1. *Substantive Evidence*

¶ 72 The only basis for admission of Vasquez's statements as substantive evidence is under section 115-10.1(c)(2) (725 ILCS 5/115-10.1(c)(2) (West 2016)), fully set forth above. Any statement sought to be admitted under the statute had to be "inconsistent with his testimony at the hearing or trial" and he had to be "subject to cross-examination concerning the statement." 725 ILCS 5/115-10.1(a), (b) (West 2016). In addition, since it was not under oath or at a hearing or other proceeding, it had to narrate, describe, or explain "an event or condition of which the

witness had personal knowledge" and was either written or signed by him, acknowledged under oath at trial, or accurately tape or video recorded. 725 ILCS 5/115-10.1(c)(2) (West 2016). Vasquez's prior statements did not meet any of these requirements.

¶ 73          Vasquez was called by the State to testify about what defendant allegedly told him while both were incarcerated. On direct examination, Vasquez either denied making the previous statements or claimed he did not remember providing those answers. The prosecutor continued to confront Vasquez with each statement he made during his police interview and Vasquez continued to disavow the statements. No effort was made to conduct an acknowledgement hearing as had already been done for witnesses Shafer and Johnson. See *Brothers*, 2015 IL App (4th) 130644, ¶¶ 74-75. Instead, the supposedly impeaching or "inconsistent" statements were read to the jury, after which Vasquez either denied making the statements or did not recall them having been made or contended the answers were not as he recalled. Specifically, he denied telling Deputy Chief Gaines (the officer taking his statement) that defendant told him he had a gun or that he fired a gun. He also denied telling Gaines defendant told him they had gone to Dixon's residence to "get their guns back." The State then recalled Deputy Chief Gaines, who testified he interviewed Adrian Vasquez on June 21, 2016. Through the testimony of Gaines, the audio and video recorded interview and the transcript of the interview were made a part of the record without objection. The prosecutor then asked Gaines all the previous questions and answers that Vasquez denied making during the interview. The statements attributed to defendant were, by this point, double hearsay in that Gaines was relating what Vasquez said defendant told him.

¶ 74          Unlike Shafer, Vasquez was answering questions on the witness stand and was subject to cross-examination by defense counsel. Where the admissibility of Vasquez's prior

inconsistent statement falls short is under section 115-10.1(c) (725 ILCS 5/115-10.1(c) (West 2016)). The statement was not admissible under subsection (c)(1), as the previous inconsistent statement was made to Mattoon police and not "under oath at a trial, hearing, or other proceeding." 725 ILCS 5/115-10.1(c)(1) (West 2016). Furthermore, the statement was inadmissible under subsection (c)(2) because it did not narrate, describe, or explain "an event or condition of which the witness had personal knowledge." 725 ILCS 5/115-10.1(c)(2) (West 2016). Personal knowledge means more than being present when the defendant makes incriminating statements; the witness must have personally observed the subject matter of his statement. See *People v. Simpson*, 2015 IL 116512, ¶ 32, 25 N.E.3d 601 (prior inconsistent statement is not admissible unless the witness actually perceived the events that are the subject of the statement or admission). There is no evidence in the record Vasquez had personal knowledge of the events relayed to him by defendant. In fact, the record reflects the only knowledge of the facts underlying his prior statement came from the defendant, as Vasquez was not present at the scene of the shooting, failing the predicate requirements for substantive admissibility. The analysis should have stopped there and his out-of-court statement should not have been admitted as substantive evidence, notwithstanding the court's failure to hold an acknowledgment hearing.

¶ 75                                    2. *Impeachment*

¶ 76          "[I]f a witness's prior inconsistent statement is incriminating to the defendant, it is *not* admissible for mere impeachment of the witness." (Emphasis in original.) *Brothers*, 2015 IL 130644, ¶ 73. In relation to a prior statement, the witness's testimony must "affirmatively damage" the State's case if the statement is to be used as impeachment evidence. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 36, 974 N.E.2d 352. "It is insufficient that a witness merely disappoints the State by failing to incriminate the defendant." *People v. McCarter*, 385

- 27 -

Ill. App. 3d 919, 933, 897 N.E.2d 265, 278 (2008). For witness testimony to be "affirmatively damaging," it must do more than fail to support the State's position; it must give "positive aid" to defendant's case. *People v. Cruz*, 162 Ill. 2d 314, 360, 643 N.E.2d 636, 658 (1994).

¶ 77    In *Cruz*, a State's witness, who had no personal knowledge of the crime, testified inconsistently with her prior statement. *Cruz*, 162 Ill. 2d at 356. On the witness stand, she denied defendant and one of the accomplices were friends who hung out together and that shortly after the crime was committed, defendant came to her residence crying, upset, and saying that he was in trouble. *Cruz*, 162 Ill. 2d at 356. After denying these statements, the State was allowed to impeach her testimony with testimony from the police officer who took her prior statement. *Cruz*, 162 Ill. 2d at 357. On appeal, defendant claimed that this witness was improperly impeached. The court stated the witness's testimony "neither contradicted any evidence presented by the State nor provided positive aid to defendant's body of evidence. As a result, while the State may have been disappointed that [the witness] did not testify in accordance with what was expected of her, the prosecution's case was no worse off than had [the witness] not taken the stand at all." *Cruz*, 162 Ill. 2d at 362-63.

¶ 78    Here, Vasquez's refusal to repeat defendant's inculpatory statements on the witness stand did not contradict any evidence presented by the State in defendant's trial. Vasquez's testimony did not provide positive aid to the defense, like providing the defendant an alibi or attributing to him exculpatory statements. Understandably, the State was disappointed when Vasquez failed to reiterate defendant's incriminating statements on the witness stand, but that is all the statement amounted to—disappointment, not affirmative damage, and therefore his prior statement was not admissible as impeachment evidence.

¶ 79        Accordingly, it was error to admit the out-of-court statement of Vasquez as either impeachment or substantive evidence.

¶ 80                              D. Testimony of Mary Jo Perry

¶ 81        "Evidence of a crime or other bad acts for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's propensity to commit crime." *People v. McGee*, 2015 IL App (1st) 122000, ¶ 25, 26 N.E.3d 529. The admission of such evidence not relevant to the offense for which defendant is on trial may over persuade the jury to convict the defendant, not based on the evidence, but because he is a bad person. *People v. Richardson*, 123 Ill. 2d 322, 339, 528 N.E.2d 612, 617 (1988). Other-crimes evidence can be deemed admissible if it is relevant to show defendant's proximity to the time and place of the offense, to prove a fact at issue, to rebut an alibi defense, or to show the defendant's consciousness of guilt. *People v. Diaz*, 78 Ill. App. 3d 277, 279-80, 397 N.E.2d 148, 150 (1979). However, even if relevant, the trial court should exclude other-crimes evidence if the prejudicial effect substantially outweighs any probative value. *People v. Placek*, 184 Ill. 2d 370, 385, 704 N.E.2d 393, 400 (1998).

¶ 82        Mary Jo Perry, who acknowledged several previous criminal convictions and her then-current participation in Coles County drug court, testified she went to Johnson's house in the early morning hours on June 17, 2016, the day before the shooting. She had been called to the residence at 2:40 in the morning and when she knocked on the door, she said defendant answered the door pointing a black handgun in her face. The State made a point to note she was seven months pregnant at the time. She testified defendant asked her to see if she could get Tyler Jordan to go to her relative's house, where defendant could "go after him," indicating later that when they met up, "bullets would fly" and that it was "going to be a war." She described Jordan as someone defendant had robbed and who he thought might have some guns. Perry testified she,

defendant, Matt Cook, Kevin Johnson, and Adrian Vasquez all "got high." She said Matt Cook also had a black handgun. After spending three or four hours at Johnson's residence, she said they all went to defendant's house, where she saw a silver revolver. She also testified she saw defendant loading it, and that at some point defendant had asked Thomas McGuire to dispose of it for him.

¶ 83　　　　Defendant's counsel interposed no objection to any of this testimony. Little of it appears relevant or otherwise admissible as an exception to the hearsay rule. This testimony does not place defendant at or near the scene of the shooting, does not prove a disputed fact, does not rebut an alibi defense, and does not show any consciousness of guilt on behalf of defendant. Perry's testimony she saw defendant in possession of a black gun could be relevant to the unlawful use of weapons charge. Her testimony about defendant having possession of a silver revolver on the day before the shooting was relevant as well. However, her testimony about defendant pointing a gun in her face while she was seven months pregnant was not only irrelevant but highly prejudicial. Furthermore, the testimony that defendant wanted her to provide access to some person named Jordan, who had no apparent involvement in this case, in order for defendant to "go after him" and that "bullets would fly," was also irrelevant and prejudicial. Her testimony about defendant and the others "getting high" and that there would be a "war" was equally irrelevant and prejudicial. Had Perry told these things to Shafer, and Shafer relied upon them to explain why he was in fear for his life when defendant and the others came to Dixon's house, there may have been some relevance, but such was not the case. The same is true of her testimony that defendant asked a third person to dispose of a gun for him. In addition to being hearsay on hearsay, it was highly prejudicial since it went to defendant's knowledge of guilt. The trial court erred in admitting this testimony.

¶ 84        The State previously filed a motion *in limine* to admit prior bad acts and other

crimes of defendant, detailing the specific statements and bad acts it sought to present through

several witnesses. The motion did not include Perry or any statements made by her. The

"Jordan" referenced in Perry's statement was not connected in any way to either the failed

attempted robbery of Justin Davis by Shafer and Magana, which precipitated their possession of

defendant's guns, or the confrontation at Dixon's residence, where Ciara was shot. We can

discern no reasonable explanation or possible trial strategy which would justify defense

counsel's failure to object.

¶ 85                                E. Plain Error

¶ 86        The first step in a plain-error analysis is to determine whether there was a clear

and obvious error at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49, 89 N.E.3d 675. As previously

noted, it was error to allow the testimony of Perry and the prior statements of Shafer and

Vasquez to be presented to the jury; nevertheless, defendant failed to object to this evidence. We

must now consider whether the admission of these statements constituted plain error.

Reluctantly, we find none of these errors amount to plain error.

¶ 87        We first note, as defendant acknowledges, he raised none of these issues before

the trial court, which would normally result in their forfeiture on appeal. *People v. Ely*, 2018 IL

App (4th) 150906, ¶ 13, 99 N.E.3d 566. However, where the defendant demonstrates plain errors

or defects affecting a substantial right, the appellate court may consider the claim. See Ill. S. Ct.

R. 615(a) (eff. Jan. 1, 1967). "The plain-error rule bypasses normal forfeiture principles and

allows a reviewing court to consider unpreserved claims of error in specific circumstances."

*People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010). "Waiver is the

intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely

assertion of a known right." *People v. Bowens*, 407 Ill. App. 3d 1094, 1098, 943 N.E.2d 1249, 1256 (2011). "In determining whether a legal claim has been waived, courts examine the particular facts and circumstances of the case." *People v. Phipps*, 238 Ill. 2d 54, 62, 933 N.E.2d 1186, 1191 (2010). In *Bowens*, this court explained the difference between waiver and forfeiture by noting trial counsel may, during the course of their representation "(1) make a tactical decision not to object to otherwise objectionable matters, which thereby waives appeal of such matters, or (2) fail to recognize the objectionable nature of the matter at issue, which results in procedural forfeiture." *Bowens*, 407 Ill. App. 3d at 1098. "Active participation in the direction of proceedings *** goes beyond mere waiver." *People v. Villarreal*, 198 Ill. 2d 209, 227, 761 N.E.2d 1175, 1184 (2001). Plain error does not apply to affirmative acquiescence. *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 12, 992 N.E.2d 184. "It is well settled that a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 60, 129 N.E.3d 755; see also *People v. Hughes*, 2015 IL 117242, ¶ 33, 69 N.E.3d 791 ("a party cannot complain of error that it brought about or participated in"). " 'When *** defense counsel affirmatively acquiesces to actions taken by the trial court, a defendant's only challenge may be presented as a claim for ineffective assistance of counsel on collateral attack.' " *Hibbler*, 2019 IL App (4th) 160897, ¶ 51 (quoting *Dunlap*, 2013 IL App (4th) 110892, ¶ 12).

¶ 88    The State argues, and the record reflects, defense counsel voiced no objection to the use of Shafer's previous testimony and agreed not only to an instruction explaining the circumstances to the jury but to the admission of both direct and cross-examination. In fact, Shafer's prior testimony was admitted into evidence as a joint exhibit. However, a foundation had been laid only for questions and answers from Shafer's direct examination during his

acknowledgment hearing. As a result, the State contends defendant has not only forfeited this issue for appeal but acquiesced in the conduct of which he now complains, removing it from plain-error analysis. We must reluctantly agree.

¶ 89           Shafer's previous testimony laid out the course of events from the botched robbery to defendant and the others looking for him for the return of the gun. It included prejudicial testimony about defendant's drug use with Shafer and others and defendant's bad reputation in the community. It included a reference to seeing the silver revolver, which was otherwise connected to defendant, being held by someone on the porch and the firing of a shot from outside as Shafer attempted to justify shooting through the door and striking his own girlfriend. It also established the motivation of those on the porch as a basis for the attempted armed robbery charge defendant was facing. It provided corroboration to Johnson's testimony as the only person to put a silver revolver in the hands of the defendant and to specifically identify a shot having been fired. As noted above, none of Shafer's testimony should have been admitted substantively. The State did not even believe it could do that. Further, it was not available for impeachment since it did no more than disappoint the State, not damage its case as required. *Donegan*, 2012 IL 102325, ¶ 36. However, defense counsel still had an obligation to voice his objection, if for no other reason than to place it in the record.

¶ 90           Although a difficult situation for trial counsel here, the involvement of the trial court as discussed above should have been more reason for lodging an objection, not an excuse for failing to do so. Counsel was aware the court was either misinterpreting section 115-10.1 of the Code or misunderstanding this court's ruling in *Brothers*; he said so in his several arguments. The conferences were in chambers and outside the presence of jurors, so there was no reason why counsel could not have respectfully disagreed and lodged his objection to the admissibility

- 33 -

of Shafer's testimony, either substantively or for impeachment. Instead, counsel waived any objection to its admissibility and assisted in the mechanism by which it was presented to the jury. Instead of arguing to the court his desire to admit the entire transcript was a less favored alternative in light of the court's ruling, the record reflects only that counsel agreed to the use of the instruction tendered. Counsel effectively waived objection to the admissibility of Shafer's trial testimony and acquiesced in its presentation to the jury.

¶ 91    Defense counsel likewise failed to object to the admission of Vasquez's prior statement. In fact, as we have noted, after seeking clarification of the source of the statements, it appears he operated under the mistaken belief they were admissible because they were purported to have come from defendant. Defendant "cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." *Hibbler*, 2019 IL App (4th) 160897, ¶ 60. Defense counsel not only forfeited the issue by failing to object but affirmatively acquiesced by agreeing on the record to the admissibility of the statements. This would preclude him from arguing the issue directly on appeal. *People v. Bush*, 214 Ill. 2d 318, 332, 827 N.E.2d 455, 463 (2005). Counsel's involvement would therefore constitute more than mere waiver, and we therefore decline to undertake a plain-error analysis regarding Vasquez's statements. See *Villarreal*, 198 Ill. 2d at 227.

¶ 92    Defense counsel also failed to object to Perry's testimony and has forfeited the issue, but, unlike the Shafer and Vasquez evidence, it is subject to plain-error review. Reviewing courts may, in the exercise of their discretion, excuse a defendant's procedural default under either one of two instances: "(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that

error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Sebby*, 2017 IL 119445, ¶ 48 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 411 (2007), quoting *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005)). The burden of persuasion rests with the defendant. *People v. McLaurin*, 235 Ill. 2d 478, 495, 922 N.E.2d 344, 355 (2009).

¶ 93    First-prong plain error is established by demonstrating "prejudicial error," *i.e.*, because the evidence was so closely balanced, "the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. Prejudice is not presumed; a defendant must meet his burden to show the error was actually prejudicial. *Herron*, 215 Ill. 2d at 187. Under the second prong, prejudice is presumed because of the importance of the right involved, irrespective of the strength of the evidence. *People v. Fort*, 2017 IL 118966, ¶ 18, 88 N.E.3d 718. Here, defendant claims error under both prongs of the analysis.

¶ 94    Defendant argues under the first prong of plain error that Perry's unduly prejudicial statements tipped the scales of justice against him when the evidence was closely balanced. *Sebby*, 2017 IL 119445, ¶ 48. Even without considering Vasquez's and Shafer's statements, Perry's statements, although prejudicial, did not relate directly to the shooting incident at all. A portion of her testimony was relevant to the unlawful use of a weapon charge; however, there was admissible testimony from several other witnesses putting defendant in possession of a handgun at some point in time. The evidence about waving the gun in her face, or his comments about Tyler Jordan, did not relate to any of the incidents referenced at trial. Multiple witnesses testified concerning: (1) defendant possessing a weapon at various times both before and after the shooting; (2) the considerable efforts defendant and his cohorts undertook to

locate Shafer to retrieve a firearm, (3) gun cases, including a case for a silver revolver, that were located at defendant's residence as well as his mother's house, and (4) the testimony from Johnson, who placed defendant at the scene of the shooting armed with a silver revolver and confirming defendant fired the gun, albeit seemingly accidentally, before Ciara was killed. While Perry's testimony certainly portrays defendant in a negative manner, it cannot be considered so prejudicial as to have had a material outcome on the case in relation to other admissible evidence available to the jury. Accordingly, we are unable to conclude Perry's testimony alone is enough to constitute first-prong plain error. Unfortunately, because of counsel's waiver and acquiescence, the testimony of Shafer and Vasquez are not subject to first-prong plain error analysis. When examining only the Perry testimony for purposes of plain error, we cannot say it was so prejudicial that it had a substantial effect on the jury's deliberations. We respectfully disagree with the dissent's assertion the remaining admissible evidence is sufficient to ensure a jury verdict worthy of our trust. As we discuss below, it is the overall cumulative effect of inadmissible evidence, far more damaging and prejudicial than that of Perry alone, which is of greater concern.

¶ 95                           F. Ineffective Assistance of Counsel

¶ 96         Defendant argues defense counsel was ineffective for failing to object to the introduction of the transcript from Shafer's trial, the admission of Vasquez's prior statement, and the testimony of Perry, and that counsel's errors are sufficiently serious that he is entitled to a new trial. We agree.

¶ 97         A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail, "a defendant must show both that counsel's

performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. Peeples*, 205 Ill. 2d 480, 513, 793 N.E.2d 641, 662 (2002). "[T]here is a strong presumption of outcome reliability, so to prevail [on an ineffective assistance claim], a defendant must show that counsel's conduct 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *People v. Pineda*, 373 Ill. App. 3d 113, 117, 867 N.E.2d 1267, 1272 (2007) (quoting *Strickland*, 466 U.S. at 686). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526. A defendant must satisfy both prongs of the *Strickland* standard, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010). "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141 (2009).

¶ 98        Defendant's counsel failed to object to the admission of Shafer's testimony as

substantive evidence or otherwise, although he initially argued with the trial court's interpretation of the case law. Without repeating the lengthy analysis from above, although it was obvious what the outcome would be, that does not excuse his failure to object to its admission. Normally, " 'what matters to object to and when to object' are matters of trial strategy." *People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007). Reviewing courts are to make every effort to evaluate counsel's performance from his perspective at the time, rather than in hindsight. See *People v. Madej*, 177 Ill. 2d 116, 157, 685 N.E.2d 908, 928 (1997). However, even when being deferential to trial counsel's trial strategy, he is still "expected to use established rules of evidence to avoid, when possible[,] the admission of incriminating statements, harmful opinions, and prejudicial facts." (Internal quotation marks omitted.) *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 32, 63 N.E.3d 211 (quoting *People v. King*, 316 Ill. App. 3d 901, 916, 738 N.E.2d 556, 568 (2000), quoting *People v. Moore*, 279 Ill. App. 3d 152, 159, 663 N.E.2d 490, 496 (1996)). The presumption resting with trial counsel's strategy may be overcome if it " 'appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 34, 145 N.E.3d 56 (citing *King*, 316 Ill. App. 3d at 916). Here, the court was going to permit the use of a codefendant's testimony at his own trial, against defendant, without the right of confrontation, either when the statements were made, or at present. As has been said before, the trial court's job is to avoid making the error, but counsel's job is to preserve that error for appellate review. He not only failed to do so by failing to object, but he then assisted in its admission without expressing why he might have felt compelled to do so.

¶ 99       The fact that counsel asked for the cross-examination to be read as well was not an unreasonable effort to lessen the effect of Shafer's testimony on the jury since it was going to

be admitted anyway and was a "trial strategy" forced on him by the trial court's interpretation of section 115-10.1 and the *Brothers* case. However, that did not prevent him from voicing his objection and noting this to be his only alternative to get some form of cross-examination before the jury.

¶ 100        Shafer's testimony included references to defendant's drug use, ownership of firearms, a reputation for being "infamous" in the community, and Shafer's uncontested statement that when he looked out the door, he saw a silver revolver that made a "flash," and he heard a "pop" prior to firing his gun through the closed door. This was damaging and highly prejudicial evidence for which no objection was shown on the record.

¶ 101        Defense counsel also failed to object to Vasquez's testimony, the purpose of which was to relay to the jury the incriminating statements defendant made to him while both were incarcerated in Mt. Vernon. According to Vasquez's previous statement, defendant admitted being at the scene of the shooting and firing a weapon shortly before Ciara's death, specifically to intimidate the occupants of the residence and retrieve his gun from Shafer. Once Vasquez denied defendant made those statements to him, or denied having said these things to the officer, they were not going to be admissible as substantive evidence under section 115-10.1. For the reasons outlined above, they were inadmissible for impeachment as well. See *Simpson*, 2015 IL 116512, ¶ 32 (prior inconsistent statement not admissible unless the witness actually perceived the events that are the subject of the statement or admission). More importantly, counsel's apparent belief the statements were admissible as long as they were made by his client was wrong. At one point, defense counsel appeared to have at least some reservations about the testimony of Vasquez, stating, "Judge, if I may, I'm going to object to [*sic*] I'm having trouble following. If these are statements that my client supposedly made to him, that's fine. Otherwise

- 39 -

they're hearsay, Judge *** I believe we're bordering on hearsay at this stage." There is then a colloquy between defense counsel, the State, and the court to clarify the statements Vasquez told the police came from defendant. Once that was determined, counsel said: "As long as we're clear that this allegedly came from my client, that's fine." The problem, of course, is that not only was it not fine, it was clearly inadmissible as hearsay and not proper impeachment. We cannot read the mind of defense counsel to explain why he believed this testimony was admissible. He sought no acknowledgment hearing, as had already been done with Johnson and Shafer, to see what the witness was going to say before the jury heard the otherwise inadmissible questions and answers. He also made no effort to determine whether the statements were being admitted as substantive evidence or impeachment in order to obtain a limiting instruction for the jury. Allowing inadmissible hearsay testimony which amounted to very damaging admissions as both substantive evidence and impeachment falls below an objective standard of reasonableness

¶ 102        Most of witness Perry's testimony was equally inadmissible. Recited in detail above, other than her references to seeing defendant in possession of a silver revolver the day before the shooting, the remainder of her testimony was highly prejudicial, irrelevant, or otherwise inadmissible. She testified that while pregnant, defendant pointed a black gun at her; that she, defendant, and others all "got high" together; and defendant was attempting to convince her to help him get access to someone named Jordan (otherwise unrelated to the case) so defendant could go after him in retaliation from a previous feud. Testimony was also permitted describing how it "would be war" and that "bullets would fly." These events were not connected to the circumstances surrounding the shooting and were not part of the State's motion *in limine* to admit prior bad acts of defendant. In reviewing defense counsel's performance *de novo*, it is difficult to comprehend why an objection to at least some of this prejudicial, inflammatory, and

irrelevant testimony was not voiced, especially in light of the fact Perry was never included in the State's pretrial motion *in limine* dealing specifically with other crimes or bad acts. Allowing highly prejudicial, irrelevant testimony depicting his client as prone to violence, without raising an objection, fell below an objective standard of reasonableness.

¶ 103 Based on defense counsel's lack of objections to any of the aforementioned testimony or statements from Shafer, Vasquez, and Perry, we must conclude defense counsel's performance was deficient and fell below an objective standard of reasonableness. However, because both prongs of *Strickland* must be satisfied to prevail on an ineffective assistance of counsel claim, we are left to determine the level of prejudice.

¶ 104 As previously stated, prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Evans*, 209 Ill. 2d at 219-20 (citing *Strickland*, 466 U.S. at 694). "In order to satisfy the prejudice prong, defendant need not show that he would have been acquitted, only that a different outcome would be reasonable, as prejudice may be found 'even when the chance that minimally competent counsel would have won acquittal is "significantly less than 50 percent" as long as a verdict of not guilty would be reasonable.' " *People v. Goods*, 2016 IL App (1st) 140511, ¶ 46, 62 N.E.3d 1168 (quoting *McCarter*, 385 Ill. App. 3d at 935, quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)).

¶ 105 In *Strickland*, the United States Supreme Court told us we should consider the totality of the evidence before the finder of fact when weighing the impact of counsel's errors. *Strickland*, 466 U.S. at 695. They noted:

> "Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been

affected in different ways. Some errors will have had a pervasive

effect on the inferences to be drawn from the evidence, altering the

entire evidentiary picture, and some will have had an isolated,

trivial effect. Moreover, a verdict or conclusion only weakly

supported by the record is more likely to have been affected by

errors than one with overwhelming record support." *Strickland*,

466 U.S. at 695-96.

¶ 106        As a result, we do not believe the proper analysis is the removal of improper

evidence we found clearly inadmissible, *i.e.*, the transcript of Shafer's previous testimony,

Vasquez's statements about defendant's admissions, and portions of Perry's testimony, to then

focus only on what remains. Instead, we need to consider the impact such evidence had on the

jury's overall view of the case. *Strickland*, 466 U.S. at 696. Even the *McCarter* case cited in the

dissent noted how we are to "consider the totality of the evidence before the finder of fact" when

weighing the impact of counsel's errors and "look to the ramifications the improper evidence

might have had on the factfinder's overall picture of events." *People v. McCarter*, 385 Ill. App.

3d 919, 936, 897 N.E.2d 265, 281 (2008). We believe both *Strickland* and *McCarter* require us

to consider the *effect* the inadmissible evidence had on that which remained.

¶ 107        At trial, the admissible and unchallenged evidence consisted of testimony

regarding defendant possessing a silver revolver, among other firearms, that he and codefendants

were trying to retrieve a gun from Shafer, and he and codefendants had been searching for Shafer

over the course of several days prior to the day of the shooting. Additionally, Johnson's

testimony placed defendant in possession of the silver revolver, and that defendant, Johnson, and

Cook were standing outside the Dixon residence trying to get the victim to convince Shafer to

come outside when, according to Johnson, defendant apparently fired the revolver by accident when he was putting it back in his pocket. After that, shots came from inside the residence and they all fled. Dixon denied knowing who was holding the silver gun and denied hearing gunshots from outside the residence before Shafer shot through the door, killing his own girlfriend. There was testimony defendant made statements about Shafer only having a limited amount of time to give the gun or "hardware" back but no admissible evidence about what was going to happen if he did not. The only admissible portions of Perry's testimony did nothing more than place defendant in possession of guns previously and in possession of a silver revolver the day before the shooting.

¶ 108          Vasquez's hearsay statements were inadmissible and highly prejudicial. The dissent, curiously enough, cites *People v. Fillyaw*, 409 Ill. App. 3d 302, 315, 948 N.E.2d 1116, 1130 (2011) in support of its conclusion the remaining evidence was sufficient. But a closer reading of *Fillyaw*, reveals the Second District reversed the defendant's convictions, finding a witness's testimony that the defendant had admitted the crimes was inadmissible under section 115-10.1 because the witness had no personal knowledge of the substance of the statements. The *Fillyaw* court ultimately found counsel was ineffective for lodging an improper objection because he was unfamiliar with the statute—much like the situation here. What did the court in *Fillyaw* consider so prejudicial? The witness's inadmissible statement of the defendant's confession—just like the testimony of Vasquez. "A confession is the most powerful piece of evidence the State can offer, and its effect on the jury is incalculable." *Fillyaw*, 409 Ill. App. 3d at 316 (citing *People v. R.C.*, 108 Ill. 2d 349, 356, 483 N.E.2d 1241, 1245 (1985)). Vasquez's statements constituted admissions toward the felony murder and confessions to both the unlawful use of weapons and attempted armed robbery by the defendant, which would have added

substantial weight to the otherwise admissible evidence to an overwhelming degree. The only admissible eyewitness testimony characterized the shot fired as accidental and the confrontation at the door as an effort to get Shafer to come out to talk to defendant and the others. Recall, the only person putting a silver revolver in the hand of the defendant at the scene was Johnson and he said it looked like defendant fired it accidentally when trying to put it away after Johnson told him it was scaring Ciara. Had the jury heard only Johnson's testimony, who, if defendant had effective counsel, would have also been subject to cross-examination on all the comments made during the acknowledgement hearing attempting to explain why he testified as he had at Shafer's trial, a jury could very well have concluded this was a tragic accident, as defendant sought to characterize it. The dissent properly noted the fact Johnson's testimony was unchallenged. However, that evidences more the ineffective assistance of counsel claim than the strength of the State's case.

¶ 109            Further, if, as the dissent argues, Johnson's unchallenged testimony was of such value to the factfinder, it must be noted Johnson denied anyone going to the residence with the intention of using force. In fact, he testified no one exhibited any show of force outside the residence and defendant was at the side of the house, not on the porch when his gun appeared to accidently discharge as he attempted to put it away. According to Johnson, they were trying to get Shafer's girlfriend to make contact with Shafer to get him to come outside. In the sterile light of hindsight, it may well do to argue the evidence may have been technically sufficient; however, that is not the lens we are told to use. We are to weigh the impact of counsel's errors and "look to the ramifications the improper evidence might have had on the factfinder's overall picture of events." *McCarter*, 385 Ill. App. 3d at 936. We cannot ignore the substantial prejudice caused by the admission and failure to challenge the clearly inadmissible testimony we have outlined to

come before the jury.

¶ 110        Prejudice sufficient to warrant concluding counsel's errors changed the outcome of the case need only be such that it undermines confidence in the outcome. *Strickland*, 466 U.S. at 694. Prejudice may be found as long as a verdict of not guilty would be reasonable. *Lucious*, 2016 IL App (1st) 141127, ¶ 45. Several witnesses, including co-defendant Johnson, placed a gun in defendant's possession. The guilty verdict of unlawful possession of a firearm by a felon was not unreasonable based on admissible testimony and evidence presented at trial. However, when considering the other counts, defense counsel's failure to object to inadmissible and highly prejudicial testimony unduly prejudiced defendant and denied him the effective assistance of counsel. Here, simply removing the testimony of Shafer, Vasquez, and Perry is not enough. The overall effect of allowing cumulative, totally inadmissible, and highly prejudicial testimony which essentially buttressed that of Johnson alone, is, we believe, sufficiently prejudicial as to undermine confidence in the outcome. "The question is not whether the defendant would more likely than not have received a different result without the professional errors of counsel but whether, with their presence, he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Moore*, 279 Ill. App. 3d at 162. Under the facts of this case, we must conclude he did not. As the court said in *Fillyaw*, "but for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different". *Fillyaw*, 409 Ill. 3d at 316.

¶ 111                         III. CONCLUSION

¶ 112        For the reasons stated, we affirm defendant's conviction and sentence for unlawful possession of a firearm by a felon but reverse the trial court's judgment and remand the case for retrial on the remaining counts.

¶ 113    Affirmed in part and reversed in part.

¶ 114    Cause remanded.

¶ 115    JUSTICE TURNER, concurring in part and dissenting in part.

¶ 116    While I concur in the majority's affirmation of defendant's conviction for unlawful possession of a firearm by a felon, I respectfully dissent from the majority's reversal of defendant's felony murder conviction because defense counsel's errors do not undermine my confidence in the jury's verdict on that offense.

¶ 117    The majority order correctly concludes defense counsel was deficient by failing to object to the introduction of (1) Shafer's testimony from Shafer's prior trial, (2) Vasquez's statements made to Gaines, and (3) Perry's testimony concerning defendant's prior bad acts. *Supra* ¶¶ 56, 79, 83. Nonetheless, even if "counsel's mistakes are egregious, we are required to examine them in the context of all of the evidence in the case to determine whether they created a reasonable probability of a different result." *Fillyaw*, 409 Ill. App. 3d at 315, 948 N.E.2d at 1130. As this court has stated, confidence in the trial's outcome is not undermined when there is no reasonable probability a different result would have been reached even if counsel would have successfully excluded the tainted evidence. *People v. Martin*, 2017 IL App (4th) 150021, ¶ 36, 80 N.E.3d 94.

¶ 118    In briefly summarizing the untainted admissible evidence, the majority notes such evidence included testimony from multiple witnesses who indicated defendant and his accomplices undertook considerable efforts to locate Shafer to retrieve a firearm and confirmed defendant possessed a handgun at various times both before and after the shooting. *Supra* ¶ 92. Specifically, this untainted admissible evidence consisted of testimony from (1) Laidley (*supra* ¶ 22), (2) Chronic (s*upra* ¶ 24), (3) Bailey (s*upra* ¶ 24), (4) Houts (*supra* ¶ 28), and (5) Burries

(s*upra* ¶ 30). Moreover, Johnson's testimony placed defendant at the scene and armed with a loaded silver revolver, which defendant discharged "seemingly accidentally," according to the majority, before Ciara was killed. *Supra* ¶ 94. Along with the admissible evidence summarized by the majority (s*upra* ¶ 94), I note the following additional damaging and highly inculpating trial evidence, which was properly admitted.

¶ 119        Magana, like Shafer, had failed to return a handgun to defendant. Data extracted from defendant's cellular telephone (cellphone) and presented to the jury showed a Facebook message was sent to Magana's cellphone from defendant's cellphone on June 16, 2016, at 11:40 a.m. The message stated,

> ¶ 120   "Bro wtf? U must lost ur mind or will to live smfh... Give it back or there will b no turning back and n thats on everything i love kid. U got a hour if u do i will make sure no one touches u him or anybody else around u. If not i wash my hands n thats a promise."

¶ 121        Further, extracted data showed a text from defendant's cellphone to Johnson's cellphone at 11:47 a.m. on June 17, 2016, which stated, "Get em back star before i kill that lil back stabbing bitch!!! I got u lovely if u do."

¶ 122        In the evening preceding Ciara's murder, defendant along with Johnson and Cook made contact with Shafer's mother, Letha Shafer, at which time defendant told Letha her son had two hours to return the "hardware." Letha testified she passed defendant's threat on to her son. Additionally, the 911 call made by Dixon and played to the jury suggests Dixon, Shafer, and the female occupant of the house believed a shot or shots had been fired from outside the house before Shafer opened fire from inside the house.

¶ 123        Moreover, I point out Johnson was a lifelong friend of defendant, and he

was clearly a reluctant State's witness. During his trial, defendant never challenged Johnson's credibility or his testimony, including Johnson's admission defendant had initially brandished his gun in a manner that startled Ciara just before she was told to text Shafer a message for him to come outside. This was moments before Ciara was killed.

¶ 124 All of the properly admitted evidence in the majority's aforementioned summary and the evidence I highlighted was unrefuted, unchallenged, and overwhelmingly inculpatory. As such, the following language from another district of the appellate court precisely sums up my view of the case *sub judice*: "Given the combined weight of this body of admissible testimony, there is no reasonable probability that the complained-of evidence had any significant impact on the jury's overall picture of events, so the fundamental fairness of the trial was not compromised." *McCarter*, 385 Ill. App. 3d at 936, 897 N.E.2d at 281.

¶ 125 I hold this view based upon the totality of the evidence presented, which takes into consideration how the tainted evidence from Perry, Shafer, and Vazquez (through Gaines's testimony) may have affected the jury's view of the properly admitted evidence.

¶ 126 As to Perry, the majority convincingly explains why her testimony pertaining to defendant's other bad acts should not have been admitted. *Supra* ¶¶ 81-84. Nonetheless, other admissible evidence informed the jury defendant had solicited Shafer to commit the violent crime of armed robbery and defendant had provided Shafer with a weapon to commit the offense. Then, when Shafer did not complete the armed robbery, defendant armed himself with a handgun and engaged in calculated threats and activities to locate Shafer to retrieve his weapon from Shafer's person. Given these uncontested facts, I do not believe any probability exists Perry's testimony about defendant's other bad acts impacted the jury's verdict.

¶ 127 Regarding Shafer's testimony (introduced by transcripts from his own

trial), that evidence included Schafer's admission he never saw defendant at the murder scene. Although Shafer did indicate a shot or shots were fired from outside the house, this fact was corroborated by Johnson's testimony and the 911 audio. The evidence defendant discharged his weapon outside Dixon's house was wholly uncontradicted, and no argument was ever made to the jury defendant did not discharge his gun.

¶ 128    As to Vasquez's statements to Gaines, my view is those statements were largely cumulative to other evidence presented at trial. One exception was Gaines's testimony Vazquez said defendant admitted he intentionally fired the gun in the air. In contrast, Johnson's testimony was vague and inconclusive on how defendant fired the weapon. Johnson did not actually see defendant fire the gun but instead heard the gun discharge and then looked at defendant and saw him holding the weapon. Johnson did not say defendant accidently or intentionally shot the weapon, but he did say it appeared defendant almost shot himself. The totality of the evidence presented to the jury regarding Johnson's observation of defendant's discharge of a firearm was as follows:

¶ 129    "Q. As you were standing, sir, in the location you indicated with Ciara, did you hear what sounded to you to be a gunshot?

¶ 130    A. Yes, I did.

¶ 131    Q. And it—you then looked toward [defendant]?

¶ 132    A. Yeah.

¶ 133    Q. And he had a gun in his hand?

¶ 134    A. Yeah.

¶ 135    Q. And I believe it looked to you like he was trying to put the gun away, and had almost shot his self?

- 49 -

¶ 136          A. Yeah, that's what I thought."

¶ 137          Regardless of how one construes Johnson's testimony, I do not believe there is any reasonable probability the jury's verdict was affected by its consideration of how or why defendant discharged his weapon. I have two bases for this viewpoint.

¶ 138          First, the defense did not rely upon convincing the jury defendant did not discharge a weapon from outside Dixon's house. Instead, defendant's defense was he did not intend to use force to retrieve his weapon. In closing argument, defendant asserted he did not fire shots at Shafer. He further contended he did not even fire a shot or shots toward or at the house occupied by Shafer and others. Moreover, defendant argued and emphasized neither he, nor Cook, nor Johnson ever made any attempt of any kind to enter Dixon's house. Further, citing Johnson's testimony, defendant argued all three ran from the scene before Shafer fired shots from inside the house, and defendant vouched for Johnson's credibility, arguing Johnson's testimony should be taken at face value that no force in retrieving the gun was ever intended.

¶ 139          Second, assuming the jury followed the law as instructed by the court, the manner in which the gun was discharged was meaningless. According to case law, the mere presence of a weapon (when other factors constituting a substantial step toward the commission of the offense are present) is sufficient to complete the crime of attempt (armed robbery). See *People v. Terrell*, 99 Ill. 2d 427, 434-35, 459 N.E.2d 1337, 1341 (1984) (citing with approval *People v. Burleson*, 50 Ill. App. 3d 629, 365 N.E.2d 1162 (1977)); see also *People v. Reyes*, 102 Ill App. 3d 820, 429 N.E.2d 1277 (1981). Thus, whether defendant's discharge of the revolver was accidental or intentional could not have had any bearing on his guilty verdict for attempt (armed robbery).

¶ 140          I further note defendant never challenged the State's argument defendant's

attempt to commit armed robbery set in motion a chain of events proximately causing Ciara's death. See *People v. Lowery*, 178 Ill. 2d 462, 467, 687 N.E.2d 973, 976 (1997) (noting that, when a felon's attempt to commit a forcible felony set in motion a chain of events which should have been within the felon's contemplation, he should be responsible for any death which results from the initial criminal conduct). In *Lowery*, the supreme court cited the committee comments to section 9-1(a)(3) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(3) (West 2016)), which clarify it is not material whether the killing under felony murder is intentional or accidental, or whether it is committed by a co-felon or a third person. *Lowery*, 178 Ill. 2d at 468, 687 N.E.2d at 977. Thus, whether defendant accidentally or intentionally fired the gun also could not have affected the jury's guilty verdict for felony murder.

¶ 141          In summary, my review of the totality of all the evidence presented leads me to conclude no reasonable probability exists the jury's verdict would have been different but for counsel's errors. I find the tainted evidence had a *de minimis* effect on the jury—it had no significant impact on the jury's overall picture of events. Unlike in *Fillyaw*, defendant here presented no alibi defense, nor was the credibility of an eyewitness challenged. *Fillyaw*, 409 Ill. App. 3d at 309-10, 316, 948 N.E.2d at 1125-26, 1130. Thus, reversal is not required because there was an abundance of undisputed, untainted, and credible evidence establishing defendant's guilt, which inspires confidence in the jury's verdict.