FOURTH DIVISION
FEBRUARY 16, 2006

No. 1-02-3276

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v.        )        No.  94 CR 4624 | | |
| | ) | |
| ANTHONY BROWN, | ) | Honorable |
| | ) | Reginald Baker, |
| Defendant-Appellant. | ) | Judge Presiding. |

MODIFIED UPON DENIAL OF REHEARING

JUSTICE MURPHY delivered the opinion of the court:

Following a jury trial, defendant Anthony Brown was convicted of murder, attempted murder, two counts of armed robbery, and attempted armed robbery.  He was sentenced to 26 years' imprisonment for murder, attempted murder and one armed robbery count, and a concurrent 6 years for the other armed robbery count and attempted armed robbery.  Defendant contends on appeal that the trial court erred in publishing to the jury the custodial statements and prior testimony of two codefendants who did not testify at trial.[1]  He argues that the statute

---

[1]Defendant raises three other contentions in the "issues presented for review" portion of his brief.  However, he does not discuss these contentions, or provide citations to authority in support of these contentions, in the "argument" portion of his brief. Contentions of error unsupported by argument or citation to authority do not satisfy the requirements of Supreme Court Rule 341(e)(7) (177 Ill. 2d R. 341(e)(7)) and are deemed waived.  Einstein v. Nijim, 358

authorizing the admission of the statements and testimony, section 115-10.2 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.2 (West 2002)), was unconstitutionally applied because it (1) infringed upon his constitutional right under the confrontation clause (U.S. Const. amend. VI; Ill. Const. 1970, art. I, §8) to confront the witnesses against him, and (2) was applied retroactively, in violation of the constitutional prohibition of *ex post facto* laws. The State concedes that the admission of the statements and testimony violated the confrontation clause but contends that this court should affirm defendant's conviction because the error was harmless beyond a reasonable doubt.

Before trial, the State filed a motion *in limine* to introduce into evidence the custodial statements and prior trial testimony of codefendants Kilsey Shearrill and Arthur Noland. The trial court denied the motion. On interlocutory appeal, this court reversed, directing the trial court to apply Code section 115-10.2. People v. Brown, No. 1-98-1669 (2001) (unpublished order under Supreme Court Rule 23). At the commencement of trial, defendant renewed his objection to the evidence from Shearrill and Noland, and the court denied the objection.

At trial, Umesh Shah testified that, in January 1994, he and his wife Elia and son Parthiv owned a store, Herman's Food and Deli (Herman's Deli), at 20 West 138th Street in Riverdale.

---

Ill. App. 3d 263, 275 (2005).

The store was separated by a wall into two separate areas, the grocery and liquor sections, each with its own exterior entrance. Every day, the exterior door in the liquor section was locked until 2:30 p.m. An interior door connected the two sections. The store had a working video surveillance system. It was not used to record, only to view from one location what was happening throughout the store.

On January 26, 1994, Umesh and Elia were working in the liquor section while employee Sandi Crosson was working in the grocery section. Shortly before noon, Umesh was preparing to make a bank deposit when a "high school student" who frequented the store entered the liquor section wearing a winter cap. When the young man came to the liquor counter with a bottle of beer, Umesh asked to see his identification. The man said that he did not have any identification, so Umesh told him that he could not buy the beer and took the beer bottle from him. The man walked "a couple steps" toward the door between the liquor and grocery sections. He then turned, said "Holdup" and fired a gunshot. Umesh was shot in the left bicep. The young man jumped up on the counter and fired another shot at Umesh, striking him in the left upper thigh. The young man then turned toward Elia and fired four shots, followed by clicking. Elia was shot in the chest. When the weapon was empty, the young man fled into the grocery section, where Umesh followed him and Crosson tried to grab him. He pushed Crosson away and fled the store headed westbound toward a nearby railway line. He had not taken any money from the store.

While in the hospital for his wounds, Umesh told the police that he could identify the young man. The police sent a sketch artist to the hospital, where he and Umesh developed a

composite sketch of the robber. On February 3, 1994, Umesh viewed a lineup at the Riverdale police station, identifying Shearrill as the young man who robbed his store.

Sandi Crosson testified that, on January 26, 1994, she was working as a cashier in the grocery section of Herman's Deli. At about noon, two young black men entered the store. One wore a bandanna covering his lower face and a Georgetown coat with the hood pulled down to his eyebrows. From the visible portion of the first man's face, including a prominent gap between his front teeth, Crosson identified defendant in court as the first man. The other man covered part of his face with a ski mask and wore a white jacket. Defendant approached the grocery counter with chips and candy. Crosson did not see where the second man had gone while she processed defendant's purchase. A third black man entered the store, wearing a white coat and a ski mask covering his entire face. He looked at defendant and then produced a revolver. Defendant jumped behind the grocery counter, shoved Crosson aside, and demanded the money from the lottery machine. When Crosson opened the lottery machine, defendant punched Crosson in the mouth and removed the money from the machine. At that moment, gunshots rang out from the liquor section. Upon hearing the shots, defendant picked up the lottery machine money and a bank deposit bag from under the counter, and the two men fled. They headed westbound toward the railway viaduct when they left the store. Crosson hit an alarm panic button and headed toward the exit to find a public telephone, the store's telephone being out of order. At this point, the man "doing the shooting on the liquor side" fled past Crosson. She grabbed him, but then let him go in the belief that he was armed. He fled westbound underneath the railway viaduct. As Grosson was telephoning the police, Umesh

appeared, severely bleeding, and said that Elia was dead. Crosson later determined that defendant had taken between $200 and $300.

On January 28, police showed Crosson a composite sketch of a man whom she identified as the man who fired shots in the liquor section and fled. On February 5, she viewed a lineup of six men at the Riverdale police station and identified defendant as one of the robbers. She was paying attention only to the area of their faces that had been uncovered on the first robber's face, and she had the men in the lineup smile so she could see if they had the robber's front-teeth gap. At trial, Crosson identified a ski mask and white coat as those worn by the third robber, the one who had pointed a revolver at her.

Dr. Edmond Donoghue, with the Cook County medical examiner, testified that he conducted the autopsy on Elia Shah on January 27, 1994. Elia was shot in the right chest, twice in the neck, and twice in the left chest. It was Dr. Donoghue's medical opinion that she died of these gunshot wounds. Dr. Donoghue recovered and inventoried three bullets from Elia's body.

Dr. Gary Merlotti, a trauma surgeon, testified that he treated Umesh Shah at Christ Hospital in Oak Lawn on January 26, 1994. Umesh had two gunshot wounds, one in the left arm with the bullet lodged in his shoulder, and one in his left thigh, where the bullet passed through. During surgery to repair the nerves and blood vessels in Umesh's left arm, Dr. Merlotti recovered and inventoried the bullet in Umesh's left shoulder.

The parties stipulated that Investigators James Tomasek, Emory Cox, and Lee Wojtas of the sheriff's police would testify that they examined the crime scene at Herman's Deli on January 26, 1994. They recovered various objects, two latent fingerprints from the liquor counter, and

five latent fingerprints from the cooler in the liquor section.  They also obtained fingerprints from Elia Shah, defendant, Shearrill, and Noland.  The parties stipulated that forensic scientist James Fazekas of the State Police crime laboratory would testify that he examined the aforementioned objects and fingerprints.  None of the objects had useable latent fingerprints, and the prints recovered from the counter and cooler did not match those of Shah, defendant, Shearrill, or Noland.

Officer Jeff Michalek of the Riverdale police testified that he responded to a call of a robbery and shooting at Herman's Deli.  Since it was stated in the dispatch that the three suspects had fled westward, Officer Michalek proceeded to the area west of the store.  After speaking with a passerby, Officer Michalek climbed up on the railway viaduct.  There, he saw two sets of footprints in the fresh snow, heading westward across the tracks and proceeding down the far side of the viaduct, where he lost the trail.  Officer Michalek requested a canine unit, and Officer Riley responded with a dog.  Proceeding from the footprint trail, Officer Riley and his dog traveled southwestward and stopped at the house of Arthur Noland.  Officer Michalek saw Noland come out of the house and begin to shovel the snow in front of his house.  The police dog with Officer Riley "alerted" or reacted to the back door of Noland's house.  Officer Michalek could not recall if the dog alerted to Noland himself.

Assistant State's Attorney (ASA) John Somerville testified that, on February 2, 1994, he went to the Riverdale police station to interview Noland.  Noland told ASA Somerville where "certain items" from the Herman's Deli robbery were located.  Noland was then allowed to make a telephone call, and he called his sister Dimiata.  Later, when the items -- a black knit ski cap, a

coat, and a revolver -- were brought to the police station, ASA Somerville showed them to Noland, who identified them as the clothing he wore and the weapon he used during the robbery. Noland gave a handwritten statement, which ASA Somerville then read into the record.

The substance of Noland's statement was that he, defendant, and Shearrill decided to rob Herman's Deli. Shearrill carried a revolver and wore a skullcap pulled down to his eyebrows. Defendant wore a skullcap, bandanna, and a Georgetown coat. Noland wore a ski mask and a Duke coat turned inside-out so as to be less identifiable. Shortly before 11 a.m. on January 26, 1994, Noland, defendant, and Shearrill went to Herman's Deli. Defendant and Shearrill entered first, Shearrill going to the liquor section while defendant stayed in the grocery section. After a brief time, so that they did not all enter the store together, Noland entered the store and demanded the bank deposit bag from cashier Crosson. As Crosson gave Noland the bag, defendant tried to open the lottery machine. When Noland heard gunshots and screams from the liquor section, he and defendant fled the store. They ran across the railway viaduct to Noland's house. By the time they reached the house, Shearrill also arrived there, having run under the tracks. Noland went outside and "acted like [he] was shoveling snow" so he "could see what was going on outside." He went back inside and the three men divided the money. Shearrill told the others that he had shot the store owners because he believed they had sounded the alarm. Noland put his cap, coat, and pistol in his bedroom closet. Later, when Noland called his sister Dimiata from the police station, he instructed her to give his weapon, ski mask, and coat to the police.

Dimiata Noland, codefendant Noland's sister, testified that, on January 25, 1994, she overheard her brother discussing with defendant and Shearrill a plan to rob Herman's Deli. She could hear clearly what her brother was saying but not what defendant or Shearrill was saying. About a week later, her brother called her from the Riverdale police station, telling her to give a bag in his closet to police officers that were coming to his home. Dimiata found the bag in the closet and gave it to the officers, who opened it. Inside were a hooded jacket turned inside-out, a black ski mask, and a pistol, which Dimiata identified in court. Dimiata testified that Danielle Nowden was defendant's girlfriend and lived across the street from the Noland home.

ASA Mark Struppa testified that, on February 3, 1994, he went to the Riverdale police station to interview codefendant Shearrill. Shearrill gave a handwritten statement, which ASA Struppa then read into the record. The substance of Shearrill's statement was that he, defendant, and Noland decided on January 25, 1994, to rob Herman's Deli, an idea suggested by Noland. They agreed to rob the store next day, and Noland provided the group two chrome revolvers. Shearrill carried one revolver and Noland carried the other. On the day of the robbery, Noland wore a ski mask and defendant wore a scarf. Defendant and Shearrill entered the store first, and Shearrill going to the liquor section. He tried to purchase a beer, but the owner asked for identification, so Shearrill turned as if to leave. When he saw that Noland had a pistol aimed at the grocery clerk, Shearrill pulled out his pistol and demanded money. When the male owner reached behind the counter, Shearrill fired two shots at him because he believed him to be pressing the alarm button. The female owner ran to her husband and Shearrill shot her. Shearrill fled when he saw that she was bleeding from her chest. He met with defendant and Noland at

Noland's house. There, they divided the money stolen by defendant and Noland and then stayed for several hours to avoid the police outside.

Kenneth Moultrie testified that, in January 1994, defendant and Shearrill were acquaintances of his. At the end of January 1994, they were guests in his Chicago home for about two days. During that time, a woman named Danielle came to visit defendant. About a day after defendant and Shearrill left, the police came to Moultrie's home.

Danielle Nowden testified that she knew defendant for over 13 years and was his girlfriend in January 1994. She knew Shearrill as a friend of defendant and knew Noland because he lived across the street from her at that time. Nowden denied that defendant had called her in late January 1994 to ask for "a car to leave town." On February 1, 1994, Shearrill called Nowden to ask her to ask his aunt, who lived near Nowden, to lend him money. Nowden denied that Shearrill had requested the money for himself and defendant and also denied that defendant had participated in the telephone call. Nowden went to Shearrill's aunt[2], Joeann Smith, and asked for the money for Shearrill. Also on February 1, Nowden called defendant at his home and later picked him up at his home in her vehicle. She denied at trial that, during that ride, defendant told her that "he got himself involved in something that he could not get out of." Nowden testified that, late at night on February 1, 1994, several police officers stopped her on the street and brought her to the Riverdale police station without her consent. There, she was

---

[2]Defendant referred to Smith as his aunt, while she testified that she was his godmother rather than his aunt.

questioned and threatened for about four hours as the officers attempted to discover defendant's whereabouts. Nowden could not identify any of the officers who arrested or questioned her beyond that they were all white males.

Nowden further testified that, during her several visits with defendant at jail, defendant did not tell her that he, Noland, and Shearrill had committed the robbery of Herman's Deli. Nowden testified that on the afternoon of February 13, 1997, she was taken by 10 armed investigators, who told her they were investigator's for defendant's counsel, to the courthouse. She identified all 10 investigators as white men. At the courthouse, she met with ASA John Coyne. She signed blank pieces of paper, rather than a handwritten statement, only because they threatened to take her children away if she did not sign. She signed her initials on each of six pages, as well as at several (but not all) of the corrections in the statement, but she was not given the opportunity to read the statement first because the pages were folded in the middle. She found no fold marks on the pages of the statement presented in court. Nowden denied making any of the assertions in the statement. She denied having been in contact with defendant from January 26, 1994, to the date of the trial, and specifically denied visiting defendant while he was staying at Moultrie's house.

Joeann Smith, codefendant Shearrill's godmother, testified that her neighbor Danielle Nowden telephoned her on January 30, 1994, telling her that Shearrill wanted to borrow money for himself and defendant. Smith would not lend the money and told Nowden to tell Shearrill to call her himself.

ASA John Coyne testified that, in his employment as an ASA, he is not allowed to carry a handgun. On February 13, 1997, ASA Paul Groah asked ASA Coyne to interview Danielle Nowden. That afternoon, Nowden came to Coyne's office. With nobody else present in the office, ASA Coyne and Nowden discussed what she knew about the 1994 robbery of Herman's Deli. ASA Coyne then asked Nowden if he could write down her statement, and Nowden agreed. Nowden gave the same information as she had earlier, and ASA Coyne wrote it down. ASA Coyne then read through the six-page statement line by line, stopping to make corrections at Nowden's request. Nowden and ASA Coyne initialed each correction and each page, and then signed the statement on the bottom of the last page. ASA Coyne did not fold any paper or give Nowden folded blank pages to sign or initial, and he did not see anybody threaten or abuse Nowden. ASA Coyne read Nowden's statement into the record.

In her statement, Nowden stated that she voluntarily went to the Riverdale police station on February 1, 1994. She had received several telephone calls from Shearrill asking her to request money from Joeann Smith, but Smith refused. Defendant had also called to tell her that he "needed a car to leave town." Defendant owned a Georgetown pullover jacket until the winter of 1994. On February 1, she picked up defendant at his home in her vehicle, and he told her during the drive that "he got himself involved in something that he could not get out of," involving Shearrill and Noland. After defendant was arrested, he told Nowden during a jail visit that he, Shearrill, and Noland robbed Herman's Deli on January 26, 1994, while he was wearing his Georgetown coat. Defendant had not been armed but Shearrill and Noland were, and defendant fled the store when he heard gunshots.

˘11˘

ASA Paul Groah testified that codefendants Noland and Shearrill each testified at his own separate trial on charges arising from the Herman's Deli robbery. Defendant did not have counsel present at either trial. ASA Groah published the testimony of Noland and Shearrill.

At his trial, Noland had testified that he was at home on the morning of January 26, 1994, when defendant and Shearrill came over. Because all three men lacked money, they had planned to rob Herman's Deli. They had first discussed the matter on January 24 and discussed it in more detail on the 25th. Noland was going to bring a broken pistol, and Shearrill was also going to bring a weapon, which he told Noland was also inoperative. Defendant did not have a weapon. They arrived at the store before 11 a.m. on the 26th, but there were too many people in and around the store, so they left. When they returned, there were no customers in the store, so Shearrill and defendant entered the store, while Noland stood outside briefly pretending to make a telephone call. Shearrill went into the liquor section while defendant remained in the grocery section. When Noland entered the store and pointed his pistol at the clerk, defendant jumped over the counter. The clerk gave Noland a money bag. Noland denied striking the clerk. When Noland and defendant heard shots from the liquor section, they fled the store and ran to Noland's house. Shearrill arrived at Noland's home a short time later, and the three men divided the money. Noland saw police officers outside his house, so he went outside and pretended to shovel snow so he could ask the officers what was happening. When Noland was brought to the police station on a later date for questioning, he initially denied knowledge of the robbery but later admitted his involvement and gave a statement, which was an accurate account of events. He also voluntarily told his sister to give the police his pistol, coat, and mask from the robbery.

At his trial, Shearrill had testified that, on January 25, 1994, he and Noland agreed to rob Herman's Deli. The next day, defendant came to Noland's home and all three men planned the robbery. Shearrill and Noland were armed with pistols, provided by Noland, and Shearrill's pistol was an automatic. Noland told Shearrill that both weapons were inoperative. Noland had a ski mask, but defendant did not. When Shearrill was in the store, he first attempted to purchase a bottle of beer, but he did not have identification and was not sold the beer. When he turned away, he saw defendant and Noland robbing the grocery section of the store. Shearrill then pulled out his pistol, pointed it at owner Umesh Shah, and shot him. Elia Shah screamed that she would give him the money, but Shearrill fired four shots at her. When he saw that she was bleeding from the chest, Shearrill fled the store, returning to Noland's home. He had taken no money from the store. He claimed that he received nothing when the proceeds of the robbery were divided, expressly repudiating the portion of his statement where he stated that he had received $40.

Shevonnia Carey testified for defendant that she worked with Danielle Nowden in February 1997. On February 13, Nowden told Carey that she kept receiving telephone calls requesting her to come to the courthouse and give a statement regarding defendant. Later that day, at about 11:30 a.m., a white man arrived at Carey and Nowden's workplace in a vehicle that appeared to be a police or government vehicle. The man did not identify himself but said that he was there to help defendant. He asked Nowden to come to the courthouse to give a statement. Nowden borrowed Carey's vehicle, stating that she was going to the courthouse. At about 6 p.m., a different man arrived at Carey's workplace in a police or government vehicle and took

Carey to the courthouse to retrieve her vehicle. While Carey waited for Nowden to come out of the courthouse, she saw her in an office with two white men. While Carey did not hear the men threaten or scream at her during the approximately 10 minutes she was in the office with Nowden, Nowden seemed upset and eventually expressed a desire to leave. One of the men told Nowden that she could leave once she signed something, and Carey saw Nowden sign a document. Carey did not see the document, but at least some of the pages were folded over or covered with a folded page. Nowden and Carey then left the courthouse. At trial, Carey could not see any crease or fold in Nowden's statement presented to her for her viewing.

Vadetta Witherspoon, defendant's mother, testified that she was present along with Danielle Nowden at each of Nowden's seven jail visits with defendant. Defendant made no admissions regarding participation in the Herman's Deli robbery during any of the visits.

The jury found defendant guilty as charged of murder, attempted murder, armed robbery, and attempted armed robbery. The court denied defendant's posttrial motion, in which he argued in relevant part that the admission of the statements and prior testimony of Noland and Shearrill was erroneous. This appeal timely followed sentencing.

Defendant contends that the trial court erred in admitting into evidence the statements and prior testimony of codefendants Noland and Shearrill because defendant's right to confront witnesses against him was thereby infringed. The State concedes that the admission of this evidence was contrary to the confrontation clause.

We agree with the State's concession. In <u>Crawford v. Washington</u>, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the United States Supreme Court overruled the constitutional

standard for admissibility of out-of-court statements prescribed in Ohio v. Roberts, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). Crawford rendered the phrases "indicia of reliability" and "particularized guarantees of trustworthiness," used in Roberts, irrelevant to determining compliance with the confrontation clause. Crawford, 541 U.S. at 60, 158 L. Ed. 2d at 198, 124 S. Ct. at 1369. Instead, the Crawford Court held that the admission of a testimonial statement by a witness not present at a defendant's trial complies with the confrontation clause only if the witness was unavailable at trial and defendant had an opportunity to cross-examine the witness at the time of the statement. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. "Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Here, defendant clearly did not have the opportunity to cross-examine Noland or Shearrill either during the interrogations that resulted in their statements or during their testimony at their separate trials.

However, we find that Code section 115-10.2, under which the statements and testimony were admitted, was not facially invalid under the confrontation clause. Statutes are presumed to be constitutional, and a facial challenge to a statute fails unless the challenger establishes that no set of circumstances exists under which the statute would be valid. People v. Cannon, 358 Ill. App. 3d 313, 317-18 (2005), citing People v. Wilson, 214 Ill. 2d 394, 398-99 (2005), and quoting In re C.E., 161 Ill. 2d 200, 210-11 (1994). Code section 115-10.2 provided at the time of

trial[3] that a "statement not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule if the declarant is unavailable." 725 ILCS 5/115-10.2(a) (West 2002). This court has considered four factors in determining whether a particular statement bears such circumstantial guarantees of trustworthiness: "(1) whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) whether the statement was corroborated by other evidence; (3) whether the statement was self-incriminating or otherwise against the declarant's interest; and (4) whether there was an adequate opportunity to cross-examine the declarant." People v. Bueno, 358 Ill. App. 3d 143, 160 (2005). Since the existence or absence of cross-examination is a relevant consideration to admissibility under the statute -- that is, since a court could exclude a statement on the basis that there was no cross-examination -- we find that Code section 115-10.2 as it stood at the time of trial was not facially invalid under the confrontation clause.

The issue, therefore, is whether the admission of the statements and prior testimony constituted harmless error. Our supreme court has recently confirmed that a conviction may be affirmed despite a Crawford violation of the confrontation clause where that error is shown to be harmless beyond a reasonable doubt. People v. Patterson, No. 98641, slip op. at 12-14 (Ill.

---

[3]Code section 115-10.2 has since been amended to provide that statements are admissible by its provisions only if "made under oath and *** subject to cross-examination by the adverse party." Public Act 94-53, § 5, eff. June 17, 2005.

December 15, 2005). "In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." Patterson, No. 98641, slip op. at 14, citing Sullivan v. Louisiana, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189, 113 S. Ct. 2078, 2081 (1993); Satterwhite v. Texas, 486 U.S. 249, 258-59, 100 L. Ed. 2d 284, 295, 108 S. Ct. 1792, 1798 (1988); and Chapman v. California, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 828 (1967).

> "[T]his court [has] listed three different approaches for
> measuring error under this harmless-constitutional-error test: (1)
> focusing on the error to determine whether it might have
> contributed to the conviction, (2) examining the other evidence in
> the case to see if overwhelming evidence supports the conviction,
> and (3) determining whether the improperly admitted evidence is
> merely cumulative or duplicates properly admitted evidence."
> Patterson, No. 98641, slip op. at 14, citing People v. Wilkerson, 87
> Ill.2d 151, 157 (1981).

Here, we find that the statements and prior testimony of codefendants Noland and Shearrill contributed to defendant's conviction. After the trial court declared that Noland and Shearrill were unavailable to testify at trial, the State called three assistant State's Attorneys to introduce the handwritten statements and prior court testimony of Noland and Shearrill. Notably, the State cited these statements and testimony in its closing argument. While these actions were in conformance with our interlocutory decision in Brown, they were in violation of

Crawford, as we stated above. The Crawford Court specifically condemned the admission into evidence of confessions by accomplices or codefendants. Crawford, 541 U.S. at 63-64, 158 L. Ed. 2d at 200, 124 S. Ct. at 1371-72 (criticizing the holdings in People v. Thomas, 313 Ill. App. 3d 998 (2000), and People v. Campbell, 309 Ill. App. 3d 423 (1999), both of which applied Code section 115-10.2).

Further, while there was significant other evidence in this case to support the conviction (Crosson's eyewitness testimony, Dimiata Noland's testimony regarding defendant's participation in the planning of the robbery, and Danielle Nowden's prior inconsistent statement implicating  defendant), we do not consider that evidence to be so overwhelming that the error in admitting Noland and Shearrill's statements and prior testimony was harmless beyond a reasonable doubt.

Finally, the improper testimony regarding the codefendants' statements was not merely cumulative or duplicative of properly admitted evidence, but was far more detailed than the other evidence presented. Since the properly admitted evidence was not overwhelming by itself but was substantially corroborated by the evidence from Noland and Shearrill, we cannot find the erroneous admission of that evidence to have been harmless beyond a reasonable doubt.

Therefore, the final issue before us is whether this cause may be remanded for a retrial. Where the evidence presented at trial, including the erroneously admitted evidence, was sufficient to support defendant's conviction, retrial is not barred by double jeopardy. People v. Melchor,  slip op. at 51-53 (November 14, 2005), quoting People v. Olivera, 164 Ill. 2d 382, 393

(1995). We find that the evidence presented at trial, as described above, was sufficient to convict defendant beyond a reasonable doubt and a retrial is thus appropriate here.

Accordingly, the judgment of the circuit court is reversed and this cause is remanded for a new trial.

Reversed and remanded.

Quinn, P.J. and Campbell, J., concur.