2023 IL App (1st) 210746-U

No. 1-21-0746

Filed August 10, 2023

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 14792 |
| | ) | |
| GEORGE KLEOPA, | ) | Honorable |
| | ) | Patrick K. Coughlin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Lampkin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's involuntary manslaughter conviction is reversed. Defendant's statement should have been suppressed, as his unwarned, unrecorded interview was a custodial interrogation. Admission of his statement was not harmless.

¶ 2    Michelle Peters was shot in the face in her own living room. A bullet pierced her cheek and lodged in her brain, ultimately killing her. What caused a handgun to discharge was the issue in

George Kleopa's involuntary manslaughter trial.[1] While Kleopa told a jury the handgun just "went off" after Peters handed it to him, the State presented evidence that he admitted to police on the night of the shooting that he was playing with the gun and squeezed the trigger. The jury found Kleopa guilty and he was sentenced to six years in prison. On appeal, Kleopa argues he did not receive a fair trial because (1) the trial court improperly admitted unwarned and unrecorded statements he made while questioned at a police station, (2) the prosecution's rebuttal argument was prejudicial, and (3) the trial court allowed the prosecution to question him about a separate firearm and a bulletproof vest, which were not involved in the incident. We reverse based on the first contention and remand for a new trial.[2]

¶ 3                                      I. BACKGROUND

¶ 4                                   A. Motion to Suppress

¶ 5        Before trial, Kleopa filed a "Motion *in limine* to suppress statements." He argued any statements from an initial, unrecorded interview with police officers were inadmissible pursuant to section 103-2.1 of the Code of Criminal Procedure (Criminal Code) (725 ILCS 5/103-2.1 (West 2010)). Section 103-2.1 makes unrecorded statements resulting from a custodial interrogation conducted at a police station presumptively inadmissible in a prosecution of a homicide offense. *Id.* § 103-2.1(b), (d). The motion was later amended to argue that the failure to record the initial interview made subsequent recorded interviews inadmissible as well. The trial court denied the motion and Kleopa's unrecorded statement—that he was playing with the gun and squeezed the trigger—was admitted at trial. The hearing on that motion and trial evidence adduced the following.

---

[1]Peters and Kleopa had a 15-year relationship and two children together. Kleopa referred to Peters as his wife, but they were never married.

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 6        Kleopa called 9-1-1 at 10:19 p.m. on March 6, 2012, to report that Peters had been shot. Chicago Heights Detective Alfredo Salinas arrived at Kleopa and Peters's residence around 10:30 p.m., where he encountered Kleopa at the doorway, covered in blood. Paramedics had already placed Peters in an ambulance, which later transported her to a hospital. A handgun, magazine, shell casing, and a large pool of blood were visible in the living room. Officer Stokes,[3] the first officer who arrived on the scene, relayed that Kleopa first told him that Peters shot herself. Kleopa denied making this statement. Later, Kleopa told Officer Stokes he had asked Peters to retrieve his gun so he could clean it, she dropped the gun into his hand, and it "went off." Detective Salinas took photographs of Kleopa and the living room. Kleopa's hands and face were swabbed for gunshot residue. Then, Detective Salinas directed Officer Stokes to take Kleopa upstairs to get a change of clothes. Kleopa testified he changed his clothes in his home, but Detective Salinas testified Kleopa changed at the Chicago Heights Police station. In any event, Detective Salinas instructed Officer Stokes to transport Kleopa to the station, take him to an interview room, and collect his bloodied clothing. Kleopa was not given a choice whether to go to the station or not.

¶ 7        Kleopa claimed that Officer Stokes handcuffed him before placing him in the police vehicle. According to Kleopa, when he asked Officer Stokes why he was handcuffing him, Officer Stokes replied, "You just shot your wife. You think I feel safe with you?" Kleopa also claimed he was handcuffed to a desk in the interview room until detectives came to speak with him. Detective Salinas testified he did not observe whether Kleopa was handcuffed before being placed in Officer Stokes's police vehicle. He denied that Kleopa was handcuffed while at the station.

¶ 8        Kleopa arrived at the station at 10:38 p.m. Detective Salinas, who had gone to the hospital, learned at 10:44 p.m. that Peters had died. Upon returning to the station and speaking with his

[3]The record does not reveal Officer Stokes's first name.

supervisor, Detective Salinas was informed the State's Attorney's Office did not consider Kleopa a suspect.

¶ 9        Along with his partner, Detective Mario Cole, Detective Salinas interviewed Kleopa at 11:30 p.m. Salinas's purpose, as he testified, was to obtain Kleopa's version of what occurred. Neither the detectives nor any other officer had given Kleopa *Miranda* warnings—that Kleopa was not required to speak with them, had the right to have an attorney present, and so on. The interview room lacked equipment to video or audio record the interview and the detectives took no other measures to record their conversation with Kleopa.

¶ 10        The detectives interviewed Kleopa for 20 to 30 minutes. During the interview, they obtained Kleopa's written consent to search his home. Kleopa asked multiple times to go to the hospital to see Peters. The detectives withheld that she had died. According to Kleopa, he only received evasive answers about Peters, such as "We're checking" and We'll let you know." Detective Salinas testified that when Kleopa asked about Peters, he replied, "we need to find out exactly what happened." Kleopa testified he did not feel he was free to leave.

¶ 11        According to Detective Salinas, Kleopa initially told the detectives he asked Peters to bring his handgun to him so he could clean it. As he was lying on the living room couch, Peters handed the gun to him, and it "went off." Detective Salinas, having viewed the living room, asked Kleopa why no cleaning supplies were there. Kleopa then told detectives he asked Peters to bring him the gun so he could "play with it." After she brought it to him, Kleopa turned it back and forth between his hands and squeezed the trigger, firing a shot. Peters then fell backwards. Kleopa denied making that statement. Detective Salinas then asked Kleopa whether he and Peters had any arguments recently.

¶ 12        The detectives stopped the interview and left the room. They informed their supervisor of

Kleopa's statement and were instructed to record any further interviews with him. At 12:45 p.m., they moved Kleopa to a different interview room with recording equipment. There, the detectives gave Kleopa *Miranda* warnings and recorded the ensuing interview, which took place in the early morning hours of March 7.

¶ 13    Kleopa was released on March 9 without being charged. The detectives conducted another recorded interview with Kleopa on July 23, 2012. The record suggests that, unlike the unrecorded interview, Kleopa never admitted playing with the gun or squeezing the trigger in either of the two recorded interviews.

¶ 14    After the July 23 interview, Kleopa was formally arrested and charged with first degree murder for Peters's death. An indictment soon followed, charging Kleopa with six counts of first degree murder. The State later amended the first count to involuntary manslaughter and nol-prossed the remaining five counts.

¶ 15    Following the hearing on Kleopa's motion to suppress, the trial court found Kleopa was not in custody during the initial 11:30 p.m. interview. In the court's assessment, the place, time, and length of the interview did not support that Kleopa was in custody. The court observed it was reasonable for police to take Kleopa to the station instead of speaking with him at his home since an active investigation was taking place there. The interview occurred just over an hour after the 9-1-1 call reporting Peters's shooting, Kleopa was only made to wait less than an hour from the time he arrived at the station, and the interview lasted roughly 30 minutes.

¶ 16    The mode and mood of questioning did not support that Kleopa was in custody either, the court noted. Both Detective Salinas and Kleopa described the nature of the questioning as general, aimed at discerning what happened, and not accusatory in nature. The court likened the questioning to basic questions a police officer would ask upon first arriving on the scene of a crime.

¶ 17        Although Detective Salinas was aware Peters had died, he did not inform Kleopa and refused his request to go to the hospital to see her. The court reasoned police could have refused the request because Kleopa was in custody; but it was also possible Kleopa could not see Peters at that time since Peters was being taken to the medical examiner and the investigation was ongoing. Nevertheless, the court noted it would consider the refusal to take Kleopa to the hospital among the totality of circumstances in its analysis.

¶ 18        The number of police officers present, the court observed, did not weigh toward Kleopa being in custody. Two detectives—Salinas and Cole—were present when Kleopa was interviewed. Yet Kleopa's own account gave no indication of being surrounded, threatened, or intimidated.

¶ 19        Neither did the absence of family members or friends during the interview support Kleopa's claim, in the court's estimation. Kleopa and Peters were the only adults at their home when the shooting occurred. No testimony indicated that Kleopa wanted to contact anyone else. He only wanted to see Peters, but the court discounted his unmet request since she was deceased by that time. Although the hearing evidence did not reveal whether police had an opportunity to contact other family members before speaking with Kleopa, there was no evidence that any family member or friend was denied access to Kleopa at the station.

¶ 20        Regarding Kleopa's age, intelligence, and mental makeup, the court found none of these would lead a reasonable person, innocent of any crime, to believe they were in custody. Kleopa was 32 years old at the time. There was no indication of any mental deficiency. At the hearing, Kleopa recalled the events and his statements clearly. He also contradicted leading questions when cross-examined. Video recording of Kleopa following the unrecorded interview showed him emotional at times but "engaging in normal conversations with the officers."

¶ 21        Similarly, the court found no indicia of formal arrest. There was no show of weapons or

force, physical restraint, booking, or fingerprinting. Nor was Kleopa told he was under arrest. He was swabbed for gunshot residue, which is sometimes done following an arrest. But, the court noted, such tests are performed promptly due to the fleeting nature of gunshot residue, and, in any event, the results would not be known for some time.

¶ 22    The court acknowledged that Kleopa was driven to the station by a police officer in a police vehicle, which is usually indicative of an arrest. The court reasoned, however, that in his emotional state, he was probably in no condition to drive himself. Further, the court noted Kleopa's testimony that Officer Stokes told him "You just shot your wife. You think I feel safe with you?" demonstrated that Kleopa was handcuffed for the officer's safety. As to Kleopa being handcuffed at the station, the court found Detective Salinas's testimony that Kleopa was not handcuffed credible. The court added, "defendant not being in cuffs is more consistent with the police thinking that they were not required to record the interview; because they were not treating the defendant as a suspect."

¶ 23    Ultimately, the court found Kleopa was not in custody during the initial, unrecorded interview. The court further found the questioning during that interview was not interrogatory. Rather, the detectives were asking about what happened and how the gun went off. The question about cleaning materials did not "call or anticipate an incriminating response," the court reasoned, since Kleopa could have given a reasonable explanation—for instance, he thought the materials were downstairs, or he was planning to retrieve them from upstairs. Kleopa's incriminating response, as the court put it, was "rather surprising." Thus, the court denied Kleopa's motion to suppress his statements.

¶ 24                                B. Trial

¶ 25    At trial, Detective Salinas testified consistently with his suppression hearing testimony. In

addition, the State presented evidence that a .40 caliber Springfield Armory XD semi-automatic handgun was recovered from the floor of the living room. The parties stipulated this handgun fired the fatal bullet.

¶ 26        Robert Hunton of the Illinois State Police was qualified as an expert in firearms and firearms identification. He explained and demonstrated that the handgun has three automatic safety features: a grip safety, a trigger safety, and a firing pin block. For the gun to fire, all three safeties had to be disengaged. The grip safety is disengaged by holding the grip, which pushes a lever inward. The trigger safety is disengaged by pressing a small lever flush with the trigger. And the firing pin block is disengaged by disengaging both the grip and trigger safeties and pulling the trigger backward. Even after disengaging all three safeties, the trigger must be fully depressed to fire the gun. Upon his examination of the handgun, Hunton found it was in good condition and not "dirty at all." Through testing, he determined the trigger required application of six pounds of force to fire.

¶ 27        The defense called John Larsen, a former FBI agent, who was qualified as a shooting reconstruction expert. After reviewing records from the medical examination and police investigation, Larsen conducted experiments to form an opinion as to the relative positions of Peters and Kleopa when the shooting occurred. Larsen determined the bullet struck Peters at approximately a 45-degree angle, traveling up and backward. He also determined Peters's face was 57 inches from the muzzle. His analysis assumed Kleopa was sitting, and Peters was standing.

¶ 28        Kleopa elected to testify. Peters put their 7-year-old and 15-month-old sons to bed around 9 p.m. Kleopa was lying on the couch, watching television. Before Peters put their younger son to bed, Kleopa asked Peters to bring him his gun. His purpose, he testified, was to "wipe it down *** clean it, to mess with it," since he was planning to sell it. The gun was "basically" Peters's. She

selected it when they purchased it years before. Kleopa had fired it at a range a few times.

¶ 29      As Peters returned and approached him, Kleopa sat up. Peters placed a magazine on the coffee table. Then, "[s]he handed me the firearm and the firearm went off immediately." Kleopa moved the coffee table and began giving Peters CPR. She was bleeding from her mouth. Realizing he needed to get help, Kleopa found a phone and called 9-1-1. He opened the front door for the responding paramedics before returning to Peters. When paramedics arrived and began attending to Peters, Kleopa was pulled away by Detective Salinas.

¶ 30      Consistent with his suppression hearing testimony, Kleopa recounted being swabbed, escorted upstairs to change clothes, and driven to the police station. When interviewed, he explained the shooting the same as he had testified—the gun "went off" in his hands after Peters handed it to him. He believed it was unloaded because Peters placed the magazine on the coffee table.

¶ 31      On cross-examination, Kleopa identified photographs of a shotgun and bulletproof vest, which police found in his closet, and acknowledged they belonged to him. He clarified that the gun was in his hands and not Peters's when it discharged. Kleopa denied that his finger was on the trigger.

¶ 32      As noted, the jury found Kleopa guilty of involuntary manslaughter and he was sentenced to six years in prison. This appeal followed.

¶ 33                          II. ANALYSIS

¶ 34      Section 103-2.1 of the Criminal Code makes unrecorded statements of the accused resulting from a custodial interrogation conducted at a police station presumptively inadmissible in a prosecution for homicide offenses, including involuntary manslaughter, unless a court finds, by a preponderance of evidence and based on the totality of the circumstances, that the statement

was voluntarily given and reliable. 725 ILCS 5/103-2.1(b), (d), (f) (West 2012). A custodial interrogation is any interrogation during which (i) a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) a question is asked that is reasonably likely to elicit an incriminating response. *Id*. § 103-2.1(a) (West 2012). Section 103-2.1(a) codifies the common law definition of "custodial interrogation" developed in *Miranda v. Arizona* and its progeny. *People v. Clayton*, 2014 IL App (1st) 130743, ¶ 26.

¶ 35    Whether a defendant was in custody is a mixed question of law and fact. *In re S.W.N.*, 2016 IL App (3d) 160080, ¶ 57. The trial court's factual findings will be upheld unless against the manifest weight of the evidence, but we review *de novo* whether suppression is warranted under the facts. *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 45.

¶ 36    Courts consider the following factors to determine whether an individual was in custody: (1) the location, time, length, mood, and mode of the questioning, (2) the number of police officers present during the interrogation, (3) the presence or absence of family and friends of the individual, (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting, (5) the manner by which the individual arrived at the place of questioning, and (6) the age, intelligence, and mental makeup of the accused. *Clayton*, 2014 IL App (1st) 130743*,* ¶ 27. No single factor is dispositive and all circumstances surrounding the questioning should be considered. *Id*. ¶ 39. Ultimately, we must determine whether a reasonable person, innocent of any crime, would have believed they could terminate the encounter and were free to leave. *Id*. ¶ 27. Applying the relevant factors and considering the circumstances surrounding Kleopa's initial interview, we find that Kleopa was in custody.

¶ 37    Kleopa was treated like a criminal suspect from the beginning. Within moments of encountering him, Detective Salinas photographed Kleopa, swabbed his hands and face, directed

him to change clothes, and instructed a police officer to transport him to a police station. The trial court reasoned that swabbing Kleopa was not indicative of an arrest since results for gunshot residue testing would take time. But the fact that police conducted the swabbing alone conveyed that Kleopa was being treated like a criminal suspect.

¶ 38        Further, police did not need gunshot residue test results to consider Kleopa a criminal suspect. The circumstances were inherently suspicious. Kleopa was covered in blood and, apart from two small children sleeping upstairs, was the only other person present when Peters was shot. The scene naturally suggested Kleopa at least knew what happened, could answer questions no one else could, and might be responsible. A reasonable person found under such circumstances would expect the police to question them. Further, they would perceive directions from police officers—including an instruction to go to the police station—as mandatory. That perception was reinforced here since the police gave him no other choice.

¶ 39        Although an interview conducted at a police station is not necessarily a custodial interrogation, the location weighs in favor of finding it to be. *People v. Wheeler*, 281 Ill. App. 3d 447, 456 (1996) (when "the police select a police station as the location for questioning a suspect, this setting naturally supports the argument that the suspect was subject to a custodial interrogation."). When a person is transported to the station by police and police give no other option for the place or time of questioning, the finding is more probable. *Cf. Clayton*, 2014 IL App (1st) 130743, ¶¶ 29-30 (detectives arriving at defendant's home at 11 p.m. and giving no other option than to ride with them to a station for questioning supported that defendant was in custody).

¶ 40        The trial court observed that the station was more suitable for questioning than Kleopa's home since an investigation was taking place at the home and Kleopa was likely in no state to drive. However, no such explanations were given and Kleopa was not provided any other option

but to go with Officer Stokes to the station immediately. Moreover, by driving Kleopa to the station he was essentially stuck there, deprived of any means to transport himself. Thus, the location of the questioning and manner of Kleopa's arrival at the station supports that he was in custody.

¶ 41    The timing of the questioning further supports that Kleopa was in custody. After allowing him to change clothes, police made Kleopa go to the station immediately. Kleopa was then made to wait alone for nearly an hour until detectives spoke with him late at night. In the meantime, Detective Salinas had learned Peters had died and discussed with his supervisor how to question Kleopa. The immediacy of Kleopa's transport and his isolation until detectives determined they were ready to speak with him supports that Kleopa was in custody.

¶ 42    The trial court credited Kleopa's unrebutted testimony that he was handcuffed for the ride with Officer Stokes to the station, but discounted this fact in its custody analysis since it appeared Officer Stokes had handcuffed Kleopa for Stokes's own safety. Even if officer safety was the reason for handcuffing Kleopa, this factor still weighed toward him being in custody. One does not reasonably believe themselves free to leave when handcuffed.

¶ 43    As to Kleopa's and Detective Salinas's conflicting testimony regarding whether Kleopa was handcuffed at the station, the court found Detective Salinas credible and that Kleopa "not being in cuffs is more consistent with the police thinking that they were not required to record the interview; because they were not treating the defendant as a suspect." The court was free to resolve the question by finding Detective Salinas more credible than Kleopa. The additional statements, however, were circular, assuming the conclusion that Kleopa was not being treated like a suspect. Further, the court's remarks reveal it gave undue weight, both to the handcuffing issue and the overall custody question, to Detective Salinas's testimony that he subjectively did not consider Kleopa a suspect at the time of the initial interview. This was improper, especially since Detective

Salinas failed to inform Kleopa that he was not suspected of a crime. " '[I]f undisclosed, an officer's subjective thoughts and beliefs are irrelevant to the assessment whether the defendant is in custody.' " *People v. Griffin*, 385 Ill. App. 3d 202, 209 (2008) (quoting *People v. Goyer*, 265 Ill. App. 3d 160, 167 (1994)).

¶ 44      We also find withholding the information that Peters had died was significant and supports that the initial interview was an interrogation. The trial court acknowledged but discounted that the detectives withheld this information on the conjecture that they could not have taken Kleopa to see Peters since the body was being taken to the medical examiner. It is of no moment whether the police could have fulfilled Kleopa's request to see Peters. Rather, the fact they did not inform him she had died reveals the police suspected Kleopa and were employing tactics designed to elicit an incriminating response. If Kleopa were "just a witness," they likely would have informed him of Peters's death immediately, or at least before questioning him. Questioning Kleopa first demonstrates the police officers wanted to see whether Kleopa would incriminate himself before potentially disrupting his cooperativeness with news that Peters had died.

¶ 45      We also disagree with the trial court's assessment that the questioning was not an interrogation. By the time the detectives spoke with Kleopa, they knew a considerable amount of information related to the shooting. Detective Salinas had viewed the scene, photographed Kleopa, and learned Peters had died. He was not like a first responder simply trying to ascertain basic facts about the situation. Further, questions need not be accusatory to be reasonably likely to elicit an incriminating response. Even broad and open-ended questions as simple as "what happened?" can satisfy this in a custodial setting. Nonetheless, when Kleopa first explained he had asked Peters to bring him the gun so he could clean it, Detective Salinas confronted Kleopa with the fact that no cleaning supplies were present in the living room. Confronting a person with facts that contradict

their statement is characteristic of an interrogation. Detective Salinas's response conveyed his disbelief of Kleopa's explanation and implicitly accused Kleopa of lying. The fact that Kleopa may have been able to offer innocent explanations, as the trial court posited, did not change the nature of this questioning.

¶ 46    In sum, we find a reasonable person in Kleopa's position would not have believed they were free to leave, and police asked Kleopa questions reasonably likely to elicit an incriminating response. The initial interview was a custodial interrogation.

¶ 47    Our finding that Kleopa's initial, unrecorded interview was a custodial interrogation makes any statements from it presumptively inadmissible pursuant to section 103-2.1. The State can rebut this presumption by demonstrating that the statements were voluntary and reliable. Since the court found Kleopa was not in custody, the presumption was not established in the original proceedings, and the State had no need to make a showing to rebut it. In some cases, further proceedings on the motion may be called for upon reversing a trial court's determination regarding custody in a motion brought under section 103-2.1, thus affording the State an opportunity to rebut the presumption. In this case, however, we find further proceedings on the motion are not called for since the record clearly established that police failed to give Kleopa *Miranda* warnings before his initial statement. Both parties elicited this fact from Detective Salinas, and it is uncontested. The lack of *Miranda* warnings alone renders statements from Kleopa's initial interview inadmissible, and this cannot be overcome by a showing of voluntariness and reliability. *People v. Sanders*, 2021 IL App (5th) 180339, ¶ 34 ("The presumption of compulsion [from a *Miranda* violation] renders unwarned statements inadmissible in the prosecution's case-in-chief, even if those statements might be considered 'voluntary' within the meaning of the fifth amendment'"). While Kleopa did not

expressly seek to have his statement suppressed on this precise basis,[4] we cannot ignore the obvious error of admitting an inculpatory statement as substantive evidence against a defendant who did not receive *Miranda* warnings in a custodial interrogation. The statements from Kleopa's initial interview should have been suppressed.

¶ 48        Although the State only introduced statements from Kleopa's initial, unrecorded interview at trial, his motion sought to suppress any statements from the later recorded interviews on March 7 and July 23. Likewise, his appellate brief encompasses the later recorded interviews as well. Section 103-2.1 of the Criminal Code extends presumptive inadmissibility to recorded interrogations that follow nonrecorded custodial interrogations. 725 ILCS 5/103-2.1(d) (West 2012); *People v. Little*, 2016 IL App (3d) 140124, ¶ 50. Similarly, postwarning statements should be suppressed when police employ a "question first, warn later" approach. *People v. Lopez*, 229 Ill. 2d 322, 366 (2008) (adopting and applying *Missouri v. Siebert*, 542 U.S. 600 (2004)). When unwarned and warned statements were taken close in time, in the same place, with the same person questioning the defendant, and the defendant was not advised the unwarned statement could not be used against them, the two sessions should be regarded as parts of a continuum. *Id*. at 364-65. The later, warned statements should be suppressed. *Little*, 2016 IL App (3d) 140124, ¶ 58. All those factors were present during the March 7 recorded interview, which began less than an hour following the initial interview. Therefore, statements from that interview should have also been suppressed. The record is insufficient for us to determine whether the July 23 interview is separate or part of a continuum with Kleopa's initial interview. Accordingly, we make no judgment regarding the July 23 interview.

---

[4]Kleopa's written motion did not include a *Miranda* violation. In oral argument on the motion, however, Kleopa's counsel asserted he should have received *Miranda* warnings before the initial interview. His brief on appeal also asserts he did not receive the required warnings.

¶ 49          Our inquiry turns to whether the admission of Kleopa's statement warrants reversal of his conviction. The improper admission of a defendant's statements to police as substantive evidence is subject to harmless error analysis. *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 57. Differing standards apply in harmless error analysis depending on whether the error was constitutional or purely evidentiary. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104. If the error involved a violation of the defendant's constitutional rights, the State must demonstrate the error was harmless beyond a reasonable doubt. *Id*. If the error was purely evidentiary, the State need only show there is no reasonable probability the jury would have acquitted the defendant absent the error. *Id*. The admission of a statement obtained when police failed to give required *Miranda* warnings is not a constitutional violation, but a violation of *Miranda*'s prophylactic rule. *People v. Gonzalez*, 313 Ill. App. 3d 607, 615 (2000) (citing *People v. Winsett*, 153 Ill. 2d 335, 353 (1992)). In our research, no Illinois court has determined which harmless error standard applies for a *Miranda* rule violation. But see *People v. Lozano*, 2022 IL App (1st) 182170, ¶¶ 94-96 (Ellis, J., specially concurring) (applying the constitutional, beyond a reasonable doubt standard to erroneous admission of statements obtained in violation of the *Miranda* rule). We need not resolve the question here since we believe the error was not harmless under either standard.

¶ 50          We cannot conclude there is no reasonable probability the jury would have acquitted Kleopa absent admission of his statement that he was playing with the gun and squeezed the trigger. The statement amounted to a confession that Kleopa committed a reckless act that caused Peters's death. Improper admission of a defendant's confession is seldom harmless. *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988). "[A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. [Citation.] This is because the defendant's admissions come from the actor himself, the most knowledgeable and unimpeachable

source of information about his past conduct." (Internal quotation marks omitted.) *Sanders*, 2021 IL App (5th) 180339, ¶ 68.

¶ 51    To convict Kleopa of involuntary manslaughter, the State had to prove he unintentionally killed Peters by recklessly performing an act likely to cause death or great bodily harm. *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 69. Without Kleopa's statement, the State's case would have relied on *res ipsa loquitur*[5] to prove Kleopa killed Peters by a reckless act. That is, the lack of direct evidence would have required the State to persuade the jury to infer from the circumstances that Kleopa must have killed Peters by a reckless act. The relevant circumstances here being that Kleopa was the only other person present, it did not appear Peters shot herself, and—if Hunton's expert testimony is accepted—the gun would not have fired unless the trigger was pulled, even if inadvertent. Although this evidence would have been sufficient to find Kleopa guilty beyond a reasonable doubt, admission of Kleopa's statement substantially increased the likelihood the jury would find him guilty. When the jury knows he admitted to recklessly shooting Peters, any doubts about whether the circumstances proved so are dispelled.

¶ 52    Accordingly, we find the error was not harmless and reverse Kleopa's conviction. As the evidence was sufficient to prove Kleopa guilty beyond a reasonable doubt, double jeopardy will not bar his retrial. *People v. Brown*, 363 Ill. App. 3d 838, 850-51 (2005) ("Where the evidence presented at trial, including the erroneously admitted evidence, was sufficient to support defendant's conviction, retrial is not barred by double jeopardy.").

¶ 53    We may address Kleopa's additional arguments only to the extent that the issues are likely to recur on retrial. *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 82. Of the two remaining arguments, we find the contention regarding evidence of the shotgun and bulletproof vest is likely

---

[5]Latin for "the thing speaks for itself." Black's Law Dictionary, 1311 (7th ed. 1999).

to recur. Kleopa argues this evidence was improperly admitted to demonstrate his criminal propensity. The State counters that evidence of the two items was relevant to show Kleopa's general familiarity with firearms. We agree with Kleopa that the evidence should not have been admitted, though for a more fundamental reason. Evidence of the shotgun and bulletproof vest should not have been elicited simply because it was irrelevant.

¶ 54 Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 50 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). We fail to see how the shotgun or bulletproof vest found in Kleopa's bedroom closet has any tendency to make it more or less probable that Kleopa recklessly caused Peters death, which, as the evidence showed, involved a different firearm. Further, the alleged recklessness was squeezing the trigger while playing with the handgun with Peters nearby. "A person is reckless or acts recklessly when he consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to another." *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 69.  Common sense is sufficient to show squeezing a gun's trigger consciously disregards a substantial and unjustifiable risk of causing death or great bodily harm. One need not possess other firearms or a bulletproof vest to appreciate the hazard.

¶ 55        III. CONCLUSION

¶ 56 Based on the foregoing, we reverse the denial of Kleopa's motion to suppress the unrecorded March 6 and recorded March 7 interviews, reverse his conviction, and remand for a new trial. Kleopa may renew his motion to suppress the July 23 interview on remand.

¶ 57 Reversed and remanded.